James Michael MILLER and Ronald Lee Lyons, Petitioners,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

March 17, 1975.

Hughie Ragan, Jackson (by appointment), for petitioners.

David M. Pack, Atty. Gen., Tom Jennings, Asst. Atty. Gen., Nashville, Whit LaFon, Asst. Dist. Atty. Gen., Jackson, for respondent.

OPINION

HARBISON, Justice.

Petitioners were convicted in the Circuit Court of Madison County, Tennessee of robbery with a deadly weapon, and each was sentenced to serve fifty years in the state penitentiary. Their convictions were affirmed by the Court of Criminal Appeals, with one member dissenting on the question of the legality of the search of an automobile. Certiorari was granted by this Court, primarily to consider the question of the legality of this search. Petitioners have, however, made other assignments of error, all of which will be considered in this opinion.

There is very little dispute concerning the facts of the case. In the early morning hours of March 3, 1973 petitioners broke into the premises of the Moose Lodge in Jackson. Mr. and Mrs. Robert Hardwick, who were employees of the lodge, were sleeping in the premises. They were commanded to come out of their bedroom with their hands up. Petitioners, armed with a rifle and a shotgun, tied them with electrician's tape, burglarized the slot machine and cash register, and took cash from both Mr. and Mrs. Hardwick. They were positively identified by their victims, and the evidence of Mr. and Mrs. Hardwick, standing alone, was clearly sufficient to support the jury verdict of guilt. Petitioners did not testify or offer proof in their defense before the jury.

In the early morning of March 4, 1973 petitioners were apprehended on the roof of another Moose Lodge, this one situated in Dickson, Tennessee, and were taken in an attempt to burglarize that lodge. At the time of their arrest they were armed and had in their possession a large duffel bag filled with burglary tools. They were arrested and taken to police headquarters.

Inquiry was made of the petitioners as to how they got to the Moose Lodge, since no automobile was found on its premises, and both of them told police officers that they were hitchhiking. On several occasions they told the police that they did not have an automobile and, in addition, the petitioner Lyons gave a fictitious name of Hackworth at the time of his arrest. Indeed it does not appear that his correct name was given to the police officials until given by his attorney at a preliminary hearing which occurred several days subsequent to the arrest.

The Chief of Police at Dickson came to the police station at the request of the arresting officers, and was suspicious of the statements of the petitioners that they were hitchhiking. Nevertheless, there is absolutely no question in the record but that the petitioners did so state, and that they disclaimed and denied any interest whatever in any automobile. This fact is highly pertinent in view of the fact that the petitioners later questioned the search of an automobile found at a motel some 100 yards distant from the Dickson Moose Lodge.

On a motion to suppress, the petitioner Lyons (who was arrested under the name of Hackworth) testified that he had been arrested and advised of his rights. He then testified:

"Q3. And I will ask you also if you didn't tell the Chief of Police that you did not have a car. That you and your associate hitchhiked in there. That you didn't have transportation?

"A. Yes, sir.

"Q4. And so then later on did they not in searching your personal effects did they obtain the car keys in that manner?

"A. Yes, sir, they did.

"Q5. But you had told them and until later what you had told them was that you did not own an automobile and had none there in Dickson. That is true isn't it?

"A. Yes, sir."

The wife of petitioner Lyons, testifying on a motion to suppress evidence, admitted that she and her husband had registered in the motel where the automobile was found, the registration being under the false name of Hackworth. She testified, however, that the automobile was registered in the name of Ronald Lyons, although neither she nor her husband ever filed any registration papers in the record in this case.

The Chief of Police of Dickson testified that in view of the heavy duffel bag found in possession of the petitioners, he felt that they must have had some transportation. Accordingly he left the police station and began to look around the vicinity of the Dickson Moose Lodge. In a nearby motel he found an automobile with Ohio drive-out tags on it, and he thereupon radioed the police station to see whether or not either of the petitioners had a set of car keys in his possession. Upon receiving an affirmative answer, he directed that the keys be brought to him at the motel. He testified:

"Q26. Up until that time again had they advised you or did you have any other information except the fact that they did not own a car.

"A. That is what they said."

The Chief said, however, that when the keys were received by him they did fit the door, the ignition and the trunk. He found incriminating evidence in the glove compartment and in the trunk, which corroborated the testimony of Mr. and Mrs. Hardwick concerning the burglary of the Moose Lodge at Jackson, Tennessee.

The Chief then directed a police officer to inquire at the motel concerning the automobile, and the officer was advised that a Mr. and Mrs. Hackworth and a Mr. and Mrs. Miller had arrived at the motel in the automobile. Investigation was made at the two rooms assigned to these persons, and the wife of Lyons, together with another woman companion was found to be in one of the rooms. The wife of Lyons gave the name of Paula Hackworth, and she told

the police that the automobile in question belonged to her. The Chief of Police testified:

"Q53. She asked you if you had a search warrant and you told her no, is that right?

"A. That's right.

"Q54. At that time you had already searched the car hadn't you?

"A. That's right.

"Q55. Now then, when she said that the car was hers what did you do with them?

"A. She said that that car is mine. You have got to have a search warrant. We fastened the trunk back and locked the car back up."

It was subsequent to this claim of ownership by Mrs. Lyons (Hackworth) that the police did obtain a search warrant for the automobile. It is the initial search, however, and the fruits of that search which were challenged by the petitioners.

Mr. Roger Dale Sanker, a police officer at Dickson, who initially arrested the petitioners, testified that he advised them of their legal rights. He then testified:

"Q6. Did they make any statement about how they got to town there?

"A. They advised they was hitchhiking.

"Q7. Did they admit or deny having any type of automobile?

"A. They did.

"Q8. They what?

"A. They said they did not have no automobile."

This officer testified further that when the two women were contacted at the motel Mrs. Lyons claimed ownership. The record is as follows:

"Q20. Did either of the girls say that she owned the car when they were contacted?

"A. Yes, sir, when we was coming out this Paula Hackworth she give her name as Paula Hackworth at the time, she is Paula Lyons, she said that was her automobile.

"Q21. After she changed the story there about giving you another name, did she give you any reason why she gave the wrong name?

"A. She never even did give her correct name until we got to the General Sessions Court and it was done over with and her attorney came back in and says, say if it makes any difference . . .

"Q22. Don't tell that. Anyway that is when you learned she had another name. Is that correct?

"A. Right.

"Q23. She as Paula Hackworth claimed ownership of the automobile?

"A. Yes, she as Paula Lyons.

"Q24. I mean she was saying she was Paula Hackworth.

"A. Yes, sir.

"Q25. And at that time there using the name of Paula Hackworth, she was the one that claimed she owned the automobile?

"A. That's right."

The officer testified that at a later date it was learned that the automobile was actually registered to Ronald Lyons, and that the arrested person, Gary C. Hackworth, was one and the same as Ronald Lyons. This was not known by the officers, however, until long after the search had been made.

■ Under these circumstances, the trial judge held that the petitioners had no standing to question the legality of the search, since they had denied ownership, possession or any interest whatever in any automobile at the time the search was made. The majority of the Court of Criminal Appeals held that the officers acted reasonably in making the search, while a dissenting member of the Court felt that the officers should have obtained a warrant before making it. The Court of Criminal Appeals, however, did not consider the basis upon which the trial court decided the case, which we think was the correct one, and that is that neither of these petitioners, under the undisputed facts, had standing to complain about the search. As a general rule one person cannot complain about the reasonableness or legality of the search of the premises or property of another. Even if the warrantless search in question was illegal or unreasonable under the circumstances, we hold that these petitioners cannot complain of it, since they denied that the automobile in question was theirs or that they had any connection with it. Had they given the correct information to the police officers at the outset, the officers could have proceeded to obtain a warrant, if one was in fact necessary; or, if the officers did proceed improperly, the true owner or possessor would then have had standing to question the search.

■ From the record, it does appear that ultimately the truth was discovered and that the automobile was in fact registered to the petitioner Lyons. He, however, had denied this, and had given an assumed name, and certainly he will not be permitted to revoke his disclaimer at his own convenience.

As stated by the Supreme Court of Missouri in the case of State v. Pruett, 425 S. W.2d 116, 120 (Mo.1968):

"Defendant disclaimed ownership of the automobile or any interest in it. He even denied any knowledge of the automobile or its presence at the curb and denied driving it there by stating he had walked to the Foster apartment. Having disclaimed any interest in the automobile searched, he cannot now, for this additional reason, be heard to question the

legality of the search or the resulting seizure. Nor can his disclaimer once made be recalled at his pleasure." See also State v. Cantrell, 310 S.W.2d 866, 870 (Mo.1958).

In the case of Bowman v. State, 211 Tenn. 38, 362 S.W.2d 255 (1962), this Court stated:

"It is the general law of this State that when one disclaims interest in the premises or possessions searched or in the articles seized he cannot question the legality of the search and seizure and it necessarily follows there can be no valid objection to evidence obtained by such search. Allen v. State, 161 Tenn. 71, 29 S.W.2d 247; Templeton v. State, 196 Tenn. 90, 264 S.W.2d 565; Dobbins v. State, 206 Tenn. 59, 332 S.W.2d 161." 211 Tenn. at 41, 362 S.W.2d at 257.

In the case of Neal v. State, 206 Tenn. 492, 334 S.W.2d 731 (1960), this Court stated:

"Defendant can not raise the question of the invalidity of the search warrant for the reason that he took the stand and testified that the whisky did not belong to him, that he did not put the whisky in the crib and did not know it was there until it was found by the officers. His stepson, Norman Carter, testified in behalf of defendant that he was the owner of the whisky, that he had bought it and paid $48 for 12 gallons of it and had placed it in defendant's crib all during the interval when defendant had gone somewhere to borrow a plow or harrow.

"Under these circumstances, the rule is applicable that when a person disclaims any interest in the premises or possessions searched, or in the article seized, he can not question the legality of the search. 79 C.J.S. § 60 p. 816, under Search and Seizure, wherein many cases are cited in notes 28, 29 and 30 supporting this rule. Especially see Brubaker v. United States, 6 Cir., 183 F.2d 894; Parr v. United States, 5 Cir., 255 F.2d 86; and many other cases."

We think these authorities are controlling here, as held by the trial judge. Indeed we note in the record that as late as May 17, 1973 in the motion to suppress filed on behalf of the petitioners, the petitioners were claiming of record that the automobile in question belonged to Mrs. Lyons, and not to either one of the petitioners. The motion, signed by both of petitioners, states:

"Under the testimony presented by Chief Baggett and Officer Sanker, revealing the search of Mrs. Lyons and Mrs. Hackworth, *and Mrs. Lyons' automobile*, it is clearly evident that this search was carried out very illegally . . . ." (Emphasis supplied).

This motion was filed of record by both petitioners over two months after their arrest. At that time they were still claiming, of record, that the automobile was not the property of either one of them, although Lyons later admitted owning it. They were also complaining of a search of the motel rooms, but it appears from the record that there was no search made of the motel rooms in the first place, and no incriminating evidence from either motel room was ever offered in evidence.

We consider it to be a close question as to whether the police officers would have been authorized in making a warrantless search of the automobile of Lyons had they been given correct information concerning its ownership, under all of the circumstances of the case. Certainly the police had strong reason to suspect that there were other persons involved, other than the two petitioners, since the petitioners were apprehended on the roof of the Moose Lodge without any apparent means of transportation. The officers were seeking both the means of transportation and the identification of other participants or accomplices and, of course, were aware of the possibility that the automobile could have been moved or transported had the search not occurred immediately. We do not find it necessary to decide these questions, however, on this record. Under no

circumstances suggested in the record does the petitioner Miller show standing to question the search, since he is not shown to have had any interest in the automobile whatever, and the defendant Lyons has disqualified himself from challenging the search by the disclaimer and false identification which he gave.

■ The other assignments of error made by the petitioners are without merit. One of these assignments is to the effect that the trial court erred in failing to grant a change of venue because of pretrial publicity. In the first place this claim is unsupported by independent affidavits or other evidentiary material in the record, other than some general news releases and some news stories resulting from civil actions and motions filed by these petitioners themselves. In addition to filing a motion to suppress evidence, these petitioners filed numerous pretrial motions, sued the sheriff, and otherwise created some notoriety in the community. All of the jurors, however, on their oaths, stated that they could try the case fairly and impartially, and we agree with the Court of Criminal Appeals that there was no abuse of discretion by the trial court in denying the motion for change of venue.

■ It is also assigned as error that two witnesses were allowed to be recalled to the witness stand after having previously testified and after the "rule" had been invoked. This matter, however, also addressed itself to the discretion of the trial judge, and we find no abuse here.

■ A further assignment of error, which was not made in the lower courts, is to the effect that evidence was introduced that the petitioners had taken from the Moose Lodge at Jackson items which were not charged in the indictment. An examination of the record, however, reveals that it was counsel for the petitioners themselves, on cross-examination, who first elicited evidence, without objection, that other items had been taken from the Moose Lodge, in addition to the cash taken from the custodians. We find this assignment to be without merit.

■ Finally, it is contended that the trial court erred in not pronouncing upon the defendants an indeterminate sentence. At the time of the trial of these petitioners the penalty for armed robbery as contained in T.C.A. § 39–3901 was life imprisonment or for any period of time not less than ten years. The statute had provided for death by electrocution, but at the time of the sentencing of the petitioners, the death penalty had been abrogated.

It is the contention of petitioners that the trial judge should have fixed their sentence at not less than ten nor more than fifty years. We agree with the Court of Criminal Appeals which stated, in response to this contention:

"However, while it is true that life is, in a sense, a maximum term, it can only be considered to be an indefinite maximum as opposed to a fixed maximum set by the legislature. It is the legislative enactment in establishing a definite maximum in terms of years which controls and is the criterion for indeterminate sentences. Here, robbery with a deadly weapon may be punished at any period of time up from ten years. In other words, there is still no definable maximum term which a jury must set, which they cannot exceed. There is still that category of crimes, once punishable by death, which the legislature in its wisdom decreed no set maximum sentence. They left that to a jury in the community where the crime occurred to establish. Therefore, robbery with a deadly weapon is a crime for which the maximum punishment may be ascertained by the jury alone and which does not come within the ambit of the indeterminate sentence law."

The judgment of the Court of Criminal Appeals is affirmed at the cost of petitioners.

FONES, C. J., and COOPER, BROCK and HENRY, JJ., concur.