**STATE of Tennessee, Appellee,**

v.

**Charles Edward HARTMAN, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Oct. 28, 1985.

Rehearing Denied Jan. 13, 1986.

Dale Quillen, Lucinda Smith Weaver, Attys.-at-Law, Nashville, for appellant.

Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville (W.J. Michael Cody, Atty. Gen. and Reporter, of counsel), for appellee.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of first degree murder in the perpetration of kidnapping, and sentenced to death upon the jury's finding of three aggravating circumstances, to-wit: the murder was especially heinous, atrocious or cruel; it was committed while defendant was engaged in kidnapping; and it was committed while the defendant was in lawful custody, etc.[1]

### I.

The victim was Kathy Nishiyama, age sixteen, who lived with her parents on Charlemagne Street, near its intersection with Highway 41A in Clarksville, Tennes-

---

1. T.C.A. § 39–2–203(i) subsections 5, 7 and 8.

see.[2] She disappeared on November 16, 1981, en route from David Lin's home to her home, a drive of approximately thirty minutes. Kathy and David had been dating for more than six months, and had planned to marry when they graduated from high school. She left the Lin residence about eight thirty p.m. David telephoned the Nishiyama residence about nine thirty p.m., and after two subsequent calls to learn whether or not she had arrived, he left his residence and began to search for her.

He found her 1978 Mustang about eleven p.m. in the parking lot of the Church of God on Lafayette Street, near its intersection with Highway 41A. The car was locked, covered with dew, and the muffler and engine were cold. Her disappearance remained a mystery, despite massive searches, until March the first, 1982.

Near the end of February 1982, James Spicer, a thirty year veteran with the Tennessee Highway Department, had a crew cleaning up litter along Highway 49 between Charlotte and Erin. He found Kathy's purse down an embankment too steep to mow, about thirty feet beyond the guard rail along the northerly side of Highway 49 in Houston County. A few days later, the residents of a trailer home near Highway 49, in a sparsely settled area, a few miles toward Erin from the place Kathy's purse was found, called the Houston County Sheriff's Department and asked that they investigate something they had found in their yard. It was a human skull, identified by Dr. Marvin Bass, Chairman of the Department of Anthropology at the University of Tennessee, and the forensic anthropologist for the State of Tennessee, as that of Kathy Nishiyama. The area was searched and her upper jaw bones and upper teeth were found, and from her dental chart and an x-ray of Kathy's skull, Dr. Bass was able to make a positive identification that such of the skeletal remains as were found were those of Kathy Nishiyama. Her bones and hair and clothes were scattered over a wide area of remote woods, but near an old road used to haul timber many years ago. Many of her bones exhibited evidence of dog tooth marks, according to Dr. Bass. He testified that the skull had been fractured by four separate blows and identified a blow over her right ear that caused a fracture that extended into the back of her skull, as the cause of death.

Most of Kathy's clothes and two-thirds of a tooth that Dr. Bass opined was knocked out by one of the four blows to Kathy's head were found near two trees that had markings in the bark, near the face of each. The Sheriff of Houston County, who was also an experienced timbercutter and woodsman, identified the two trees, standing approximately eight feet apart. On cross examination, the sheriff said the markings in the bark of the two trees could have been caused by someone being tied between the two trees, and that the markings were made after the growing season of 1981 had ended, and were four to six months or less in age.

Defendant Hartman, although convicted of an offense calling for time in the State Penitentiary, was serving that sentence in the Dickson County Jail, at Charlotte, where he had the status of trusty. He worked on patrol cars assigned to the sheriff's office and there was evidence that he performed other work for the sheriff and Deputy Carroll Fizer. It was shown that Deputy Fizer used Dickson County Sheriff's patrol car number five most of the time; that it was a 1978 Plymouth, white with green stripes, gold stars on the front doors, a heavy wire screen between the front seat and the back seat; that the rear doors could not be opened, nor the rear windows rolled down from the inside; that it had a full blue light bar across the roof. The evidence also revealed that the Montgomery County Sheriff's Office had no Plymouths at that time; that all of its

---

2. A sketch of the relative locations of places where events significant to this case occurred, is attached as an appendix to this opinion.

patrol cars were Chevrolet Malibu's, although they were also white with some green trim, similar to all county patrol cars in the State of Tennessee.

On November 16, 1981, at approximately 6:00 P.M., Deputy Fizer, apparently with the knowledge of Sheriff Doyle Wall, turned over custody of car number five to defendant at a tobacco barn near Fizer's residence, with instructions to return to the Dickson County Jail at Charlotte. Defendant did not arrive at the jail in Charlotte until 3:30 a.m., or later, on November 17, 1981.

Richard Owen Hughes lives on Jarmon Hollow Road in Palmyra. On November 16, 1981, he left work at the coca-cola company at 6:00 p.m. and was on his way home on Highway 49, when he passed a patrol car that later followed him for about four miles. After he turned onto Jarmon Hollow Road, the patrol car turned on its blue lights, and Hughes pulled over, stopped, got out of his car and walked back to the patrol car. The driver of the patrol car first asked to see his license, then said he did not need to see it, and that he needed directions to get back to Dickson County.

Terry Taylor crossed the Cumberland River at Cumberland City about 6:00 p.m. on November 16, 1981. He drove to Palmyra on Highway 149, stopped at a friend's house for twenty to twenty-five minutes. He then headed toward Clarksville on Highway 149. About six miles from Clarksville he observed the headlights of a vehicle overtaking him rapidly, and after they crossed the ridge, blue lights were turned on, and he pulled off the road. After waiting several minutes he got out of his jeep and walked back to the patrol car with his driver's license in his hand. The driver of the patrol car saw his driver's license, but told Taylor that was not the reason he stopped him; that he was from Dickson County, was on a "big drug bust," and had gotten lost and wanted to know how to get back to Dickson County. Taylor instructed him where to turn to get on Highway 13, and then Highway 48 to Dickson County. Both proceeded towards

Clarksville on Highway 149, but Taylor saw a friend in a yard along the way and stopped to chat for five or six minutes. When Taylor reached the Hilltop Market he saw the patrol car sitting at the edge of the parking lot. He pulled in behind him and the driver got out and asked if they were at the intersection where he should turn. Taylor responded that it was the next intersection where he should take a right turn.

At trial, Taylor positively identified the driver of the patrol car that stopped him and that he conversed with at the Hilltop Market as defendant Hartman, and identified the patrol car as a white Plymouth with green stripes. He testified that the driver was not wearing the uniform of a police officer, that his shirt and pants were army-type work clothes; that the driver said he was late and had to hurry back to Dickson County; that it was after seven p.m. when defendant drove away from the Hilltop Market towards Clarksville and Highway 13. Taylor also testified that forty-five minutes or more after leaving the Hilltop Market he telephoned the Montgomery County Sheriff's Office and reported that he had been stopped by a patrol car driven by a person not in uniform, who said he was from Dickson County and was lost; that he described the car and told the Montgomery County officer that he didn't think the driver of the patrol car that stopped him was an officer and didn't think he should be stopping people.

Sergeant Nelson confirmed that he received the call from Taylor at approximately 8:30 p.m. He testified that he proceeded to ascertain the location of the three Montgomery County patrol cars that were out at that time, and after locating them he contacted Stewart, Houston, and Dickson Counties to determine if any county had a missing patrol car and received negative responses. However, he further testified that at 11:00 p.m. he put out a bulletin that Dickson County had reported a missing patrol car described as a four-door 1978 Plymouth, white with green stripes and full blue light bar across the roof and a missing trusty, identified as Eddie Wayne Hart-

man, white male, born April 25, 1958, five foot, eight inches in height, one hundred fifty pounds, blue eyes, brown hair and fair complexion.

Betty Diane Smith lived in Palmyra, had picked up her daughter after completion of her baton lesson at Austin Peay Armory a little after 7:00 p.m. on November 16, 1981, and drove to the Sack 'N' Pack Market for gas. She turned onto the road beside the Sack 'N' Pack without giving a turn signal, looked to her left, and saw a policeman sitting there, and remarked to her daughter that she was going to get a ticket. But, as she was pumping gas, the patrol car crossed the street to a fish restaurant and made a circle in the parking lot. Mrs. Smith left the Sack 'N' Pack for Palmyra, and she noticed headlights behind her as she passed the Hilltop Market on Highway 149. That vehicle followed her for eight or nine miles and as she crossed the bridge near Hematite Road, "the police lights went on." Mrs. Smith testified that she was "alarmed" when the driver of the police car came to her car window and she observed he had long hair, was not in uniform, and had no badges. She asked him if he was the "same cop that was sitting up at the Sack 'N' Pack," and he responded affirmatively with a quiver in his voice. She asked why he had stopped her and he responded that there had been a hit and run in front of the Golden Cue, "that they radioed him and gave him a car of my description, and told him to follow me to see if I would run from him." He asked for her driver's license, took it to the patrol car, was gone "quite a while" but returned the license and allowed Mrs. Smith and her daughter to leave. Mrs. Smith testified that he shined his flashlight on her daughter the entire time he was at the window of the car. In March of 1982, she was watching a newscast and recognized a picture of defendant Hartman as the man in the patrol car who had stopped her on November 16, on Highway 149. She positively identified him at trial as that person.

Walter Allen DeShields, Jr. worked at Grandma's Market between the hours of six and nine p.m. He testified that on November 16, 1981, a patrol car pulled up to one of the gas pumps, bought five dollars worth of gas, and drove off. He identified the patrol car as like a photograph of Dickson County Sheriff's car number five and he also observed that it had a screen between the front and the back seats. Within a few days after November 16, 1981, men in the same kind of patrol car, who identified themselves as being from Dickson County, came to Grandma's Market and asked him if he had sold gas to someone driving a Dickson County patrol car on the night of November 16, 1981, to which he responded affirmatively.

Carol Leigh Estes lives in Clarksville three minutes driving time north of Highway 41A. She left her home about 9:00 p.m. on November 16, 1981, to go to Krogers. As she passed Lafayette Road on Highway 41A she saw a police car with flashing blue lights that was stopped on the right side of Lafayette Road, close behind a smaller car "right in front of the church."

Jackie Ross Jackson lives in Clarksville not far from the intersection of Lafayette Road and Highway 41A. He was on his way home, and when he turned on Lafayette Road he saw a "county police car" stopped behind a brown car. Neither car had lights on, and he observed a man of normal height and weight with shoulder length hair standing beside the brown car. He didn't pay much attention and did not know the time except that it was before 10:00 p.m. on November 16, 1981.

About 9:15 p.m. on November 16, 1981, Detective Roger Meckley of the Clarksville Police Department observed a county patrol car "coming into town from 48/13," driven by a white male with shoulder length brown hair, wearing a green jacket. Fifteen minutes later he saw the same patrol car pass, headed in the opposite direction out of town on Highways 48/13. Meckley's friend, Danny Wayne Bryant, was in the car with the detective when the out-of-county Plymouth patrol car came by going out of town.

Proof was adduced that there was no record that any Montgomery County officer had stopped vehicles in the area that the Dickson County patrol car was seen stopping vehicles and that all Montgomery County officers that were on patrol that evening were in uniform.

On November 23, 1981, seven days after Kathy disappeared, FBI agent Cox went to the Dickson County Jail and interviewed defendant. He advised defendant that he was assisting the Clarksville and Montgomery County officers in the investigation of the disappearance of Kathy Nishiyama; that information had been received that defendant was seen driving a patrol car in the Cumberland Heights section of Montgomery County.

Defendant told Cox that he was at a tobacco barn with Deputy Sheriff Carroll Fizer on November 16, and that about 6:00 p.m., Fizer turned the patrol car over to him and instructed him to return to the Dickson County Jail at Charlotte; that he knew that Willie Herrell was wanted by the police and it might help him get released earlier if he could locate Herrell, so he drove by Herrell's house, but did not see his automobile and did not stop to inquire; that he then became lost and ended up in Palmyra, where he used the patrol car lights to stop a car driven by a "boy" and asked for directions; that he stopped another car, also asked the driver for directions, and followed that car to Highway 48. Defendant told Cox that he realized he had been gone a long time and needed an explanation for being late, so he drove the patrol car in Big Barton Creek near Stayton Road, got stuck, and could not get the patrol car out of the creek; that he walked several miles to a residence where no one was home, and later walked to another residence where they had no telephone—but eventually that Willie Herrell arrived in a white van and pulled him out of the creek; that he returned to Charlotte about 3:30 a.m.

Kenneth Atkins was Assistant District Attorney of Dickson County in 1981, and learned of the missing patrol car episode in mid-December of that year. He tape recorded an interview of defendant and had it transcribed. Atkins gave defendant *Miranda* warnings. Defendant told Atkins that he had told Sheriff Wall and the FBI man everything he did that night, and Sheriff Wall had checked out his story. Although a number of details were different, in substance the statement defendant gave Atkins was the same as that given the FBI agent earlier.

Willie Herrell testified that he was arrested by Sheriff Wall and Deputy Fizer on November 23, 1981; that they had defendant in the patrol car with them at the time of the arrest; that he was driven to a creek and asked if he pulled a patrol car that defendant was driving out of that creek. Herrell testified that he had not been down that road to the creek in years, prior to the day of his arrest, had not seen defendant for six to eight months prior thereto, and did not pull him out of the creek; that the Sheriff and his deputy tried to get him to say he had pulled defendant out of the creek, but he refused to do so.

Several officers of the Dickson County Sheriff's Office testified that they saw a substance they believed to be blood on the right rear of patrol car number five after defendant returned that car to the jail at Charlotte. Patrol car number five was not processed for evidence relevant to the murder of the victim until March 1982, and at that time nothing was found.

Raven "Snake" Frazier testified that he became acquainted with defendant at the state penitentiary and related a number of incriminating statements that defendant made to him. According to Frazier, defendant told him that he "put the lights" on the girl, told her that there was a sickness in her family, to lock her car and come with him; that he got "it" in the back seat and that it was so good that he took her out of the car, killed her and did it again; that she was not the angel that her boyfriend thought she was; that she "had had it one or more, two or three times."

Defendant presented witnesses who testified that Frazier would do anything to

secure early release from the penitentiary and that he was an habitual liar. A former District Attorney General testified about other attempts by Frazier to supply information in exchange for favorable treatment.

## II.

Defendant contends that the evidence is insufficient to establish the guilt of defendant beyond a reasonable doubt.

■ The evidence in this case unerringly places defendant in the location from which Kathy disappeared, at the time she disappeared, with a demonstrated disposition for stopping motorists with the "blue lights" of the patrol car and a clear implication that, in the current vernacular, he was "looking for some action." From the testimony of Carol Estes and Jackie Jackson the jury could have found that defendant stopped Kathy across the street from the church where her car was found. His statements of his actions between 6:00 p.m. and 3:30 a.m., on November 16–17, 1981, leave ample time for the kidnapping and murder of the victim. His excuses of being lost and deliberately driving into the creek to account to the sheriff for his extended absence simply do not fill the hours between 9:30 p.m. and 3:30 a.m. and stand in this record without corroboration that has probative value.

We find that the evidence of defendant's guilt satisfied the standard prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and T.R.A.P. 13(e).

## III.

Defendant contends it was error to deny his motion for a change of venue. He asserted in support of his motion, the content and extent of pre-trial publicity. Defendant's brief in this Court simply cites us the seventeen factors listed in *State v. Hoover*, 594 S.W.2d 743 (Tenn.Crim.App. 1979), to be considered where pre-trial publicity provides the ground for a change of venue, and asserts that numbers one, two, three, four, five, twelve, thirteen, fourteen and fifteen are the key factors in this case. In the trial court defendant introduced over twenty articles from the *Clarksville Leaf Chronicle* about the case, most of which appeared in that newspaper in 1982. The trial of this case began on May 9, 1983, and the prospective jurors were called and examined one at a time, out of the presence of all other prospective jurors, and the trial judge gave preliminary instructions that the examination of a prospective juror was not to be discussed with the other jurors or prospective jurors. The court excused all jurors whose opinion was to any extent affected by newspaper or television reports about the case.

■ Our review of the voir dire reveals that the jury selection procedure was carefully conducted by the trial judge and that a fair and impartial jury was selected without difficulty. We have carefully examined the defendant's proof in support of the factors asserted by defendant to be significant in this case, and we find that the trial judge did not abuse his discretion in denying a change of venue. *See Rippy v. State*, 550 S.W.2d 636 (Tenn.1977).

## IV.

Defendant contends that reversible error was committed by the prosecution's withholding of exculpatory evidence.

Nancy Liehr gave a statement to a Montgomery County officer and a T.B.I. agent prior to trial that she believed she saw Kathy driving north on Highway 41A, at approximately nine-thirty on November 16, 1981. She was subpoenaed by the State but not called as a witness to testify at trial. Defendant called her as a witness at the sentencing hearing and sought to use her testimony in support of a non-statutory circumstance, to-wit: his innocence. She testified out of the presence of the jury and there was a lack of certainty in her testimony with respect to the date she saw a girl that she believed to be Kathy Nishiyama.

The State had furnished defendant with a transcript of a statement by Jackie Ross

Jackson, but it was discovered that two pages were missing, and those pages contained Jackson's reference to the patrol car that he saw near the church as a *Montgomery County* patrol car. Defendant claims that that statement was inconsistent with Jackson's testimony at trial where he said that it was a green and white county patrol car, as distinguished from a city patrol car, which he knew to be blue and white. It appears that the omission of the two pages may have been negligent rather than intentional, but in any event, defendant had the benefit of the two missing pages when Jackson testified, and fully cross-examined him on the description of the patrol car, and played to the jury the tape recording from which the transcript was made.

Defendant claims that the State withheld a statement by Willie Herrell to Roger Sanker, a criminal investigator for Dickson County, that he had pulled defendant out of a creek about two a.m. on the night of the crime. Our reading of the record discloses that Sanker testified that Herrell told him that he was too drunk to remember whether he pulled a car from the creek.

Robert Rye orally reported to a Montgomery County detective and a Clarksville officer that he had seen a girl matching Kathy Nishiyama's description walking across a field. As a result of those reports, two searches were made of the area of the sighting and nothing relevant to this crime was found.

In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court dealt with the issue of whether the prosecutor has a constitutional duty to volunteer exculpatory matter to the defense, and if so what standard of materiality gives rise to that duty. After noting that unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside, and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose, the Supreme Court continued as follows:

Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure. But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. *Id.* at 108, 96 S.Ct. at 2399–400.

The Court further reasoned that the question of whether defendant has been denied a fair trial depended upon the materiality of the suppressed evidence and then articulated the standard for determining materiality as follows:

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. *Id.* at 112–113, 96 S.Ct. at 2401–02.

The omission of two pages of Jackson's statement wherein he identified the patrol car as a Montgomery County patrol car is not subject to this test because it was fully available to defendant at trial.

■ After carefully evaluating the suppression of the evidence Nancy Liehr revealed to officers, that was not obtained by defendant, the neutral statement of Herrell, and the questionable sighting by Rye, in the context of the entire record, it is our opinion that the omitted evidence does not create a reasonable doubt of guilt of de-

fendant and would not have affected the outcome of the trial.

## V.

Defendant contends that the testimony of Jackie Ross Jackson should have been suppressed because he was subjected to hypnosis prior to trial.

■ The trial judge required the State to give defendant the two statements made by Jackson before the hypnosis and the statement made by Jackson during hypnosis. The trial judge restricted Jackson's testimony before the jury to the facts he had related in his pre-hypnosis statements and did not allow any testimony as to the facts elicited only during hypnosis. We find no merit in defendant's assertion that the requirements of *Glebock v. State*, 616 S.W.2d 897 (Tenn.Crim.App.1981), were not met.

Defendant again places great emphasis on the fact that two pages of the statement of Jackson were missing wherein he referred to the patrol car as a Montgomery County patrol car. Jackson explained that it was a green and white patrol car which he automatically assumed was a Montgomery County patrol car because it was in Montgomery County and he knew it was not a Clarksville city police car, which would be blue and white. The record establishes that both Montgomery and Dickson County patrol cars are white with green stripes or trim and in 1981 were principally distinguishable by the fact that Dickson County's were Plymouths and Montgomery County's were Chevy Malibus, a distinction that would not be readily apparent to most observers. Also, when the driver of a patrol car stops another vehicle, observers assume, as Jackson did, that legitimate police business is involved, and Montgomery County officers had jurisdiction at the place Jackson saw defendant.

## VI.

Defendant says that he was denied a fair trial by numerous instances of prosecutorial misconduct.

Defendant charges the prosecution with improperly stating that, "Well, I want the truth to come out," implying that defendant was hiding the truth, and was involved in a cover-up of his guilt in conspiracy with officers from Dickson County.

The record does not support defendant's assertion that the prosecution stated during the testimony of David Lin and Ray Jackson that he wanted the truth to come out.

■ Complaint is made because the prosecutor asked Ray Jackson "will you tell why you are no longer a deputy sheriff?" An indictment was pending against Jackson and it was clearly improper to attempt to question the defendant's witness about that indictment. However, the question was innocuously phrased, the judge promptly sustained defendant's objection and the jury was not made aware of the fact that there was a pending indictment. This error resulted in no prejudice to defendant, was insignificant and harmless.

■ The prosecutor referred in his opening statement to the conspicious absence of Dickson County officers, and defendant asserts that he was implying that the defendant was hiding information from the jury. We do not think that the prosecutor's veiled and ambiguous reference to the role of the Dickson County officers implied defendant was hiding information from the jury. The most obvious implication, if any, was simply that the officers who put defendant in custody of a sheriff's patrol car on the night of November 16, 1981, were embarrassed, or negligent and would not be available to testify. During the trial the jury also learned that Sheriff Wall and Deputy Fizer were no longer with the Dickson County Sheriff's office and that a civil suit was pending against them involving the events of November 16, 1981.

The prosecution made an effort to elicit testimony about the operation of the Dickson County Sheriff's office, and matters having political overtones, and explained its theory of admissibility outside the presence of the jury, but the trial judge rejected the

prosecution's theory of admissibility and did not allow any irrelevant evidence on that subject to reach the jury.

We find no merit to any of defendant's claims that the improper conduct of the prosecution denied him a fair trial.

### VII.

Defense counsel asserts that the trial judge entered two orders that limited his preparation for trial to the prejudice of defendant. It is not clear which order defendant relies upon with respect to the prohibition of witnesses from giving depositions in the civil case brought by Ralph Nishiyama because, as in many instances in defendant's brief, there is no citation to the record as is required by the rules. However, it is clear that there were no restrictions ordered that encumbered or deferred defendant's preparation for the criminal trial. Orders with respect to the civil trial had no effect whatever upon counsel's preparation for the defense of defendant. Counsel's assertion that the order in regard to the civil case foreclosed his access to the exculpatory evidence of Nancy Liehr is totally without foundation.

█ With respect to the second order, defendant asserts that he was "prohibited ... from informing potential witnesses the reason for pre-trial interrogation, or mentioning to potential witnesses that the defendant had passed a polygraph test." Again there was no citation to the record. Our search of the record discloses that the restrictions upon all counsel with respect to polygraph examination and the results thereof were discussed at a hearing on April 21, 1983. The trial court had issued a gag order theretofore that simply tracked the language of the Code of Professional Responsibility, prohibiting all the attorneys from discussing with members of the public or representatives of the media any of the facts of the case. The prosecution had filed a motion on April 11, 1983, asserting that defense counsel had in "extrajudicial contacts" referred to polygraph examinations given to witnesses and defendant, in violation of the gag order, supported by affidavits. As a result of the hearing the Court simply added to the gag order an explicit prohibition with respect to discussing polygraph tests or results with members of the public. The trial judge expressed apprehension that such discussion could have an effect upon prospective jurors. At the same time, the trial judge ordered counsel not to mention at trial that a polygraph test had been administered or what the results were. Defendant does not question the inadmissibility of polygraph tests and we find that the trial judge's orders with respect to polygraph tests were proper and free of error.

### VIII.

Defendant says he was denied a fair trial by the recall of Ralph Nishiyama, the victim's father, to "clarify and explain the testimony of Officer Oakes."

█ Kathy's father, Ralph, testified that her purse was not in the car when it was found. Then Officer Oakes, the first policeman to arrive on the scene, testified he saw a brown purse resembling Kathy's on the floorboard of the car. Over objection, the State recalled Mr. Nishiyama, who had heard Oakes testify, to testify that Kathy's brown beret had been lying in that part of the car. Permitting a witness to be recalled is a decision resting in the sound discretion of the trial judge. *Lillard v. State*, 528 S.W.2d 207, 212 (Tenn.Crim.App. 1975). Likewise, admitting the testimony of a witness who has testified and then been allowed to remain in court and hear other testimony is a matter within the trial court's discretion. *See Miller v. State*, 520 S.W.2d 729, 735 (Tenn.1975); *Bryant v. State*, 503 S.W.2d 955, 959 (Tenn.Crim.App. 1973). There is no merit to this issue.

### IX.

█ Defendant asserts that the trial judge improperly limited his cross examination on the witness Raven Frazier. He says that he was not allowed to pursue questions bearing upon Frazier's credibility that were raised at a previous trial wherein

Frazier's "character had been accused." Our examination of the record reveals that the trial judge refused to allow defendant's counsel to explore the argument of the prosecution in the prior case reflecting the views of the district attorney on the question of Raven's credibility. It is hard to conjure a more irrelevant source of evidence than what a lawyer had to say, in argument, at a prior trial. There was no error in the trial judge's action in so limiting the cross examination of a witness on a defendant's credibility.

■ Defendant also complains that the trial court refused to direct Frazier to answer questions in the affirmative or negative, allowing him to answer more than twenty questions, "not to my knowledge." Defense counsel never requested that the trial judge so instruct the witness and it was not an inappropriate response to most of the questions asked. We do not find that defendant was improperly impeded in his all-out assault on the credibility of Frazier, as the witness's motivation, bias and prejudice were fully presented to the jury.

### X.

Defendant asserts that he was prejudiced by the trial judge's denial of his pre-trial motion to require the State to provide him with a copy of statements allegedly made by the defendant to TBI Agents Fortner and R.O. Rivera, at the time a polygraph examination of defendant was conducted.

■ This motion was heard on April 6, 1983, at which time the prosecution denied that it had such a statement or statements. The trial judge directed the Attorney General to contact Fortner and Rivera, ascertain whether signed statements had been made by defendant, and if so he was directed to furnish same to counsel for defendant. As a result of a subsequent discussion at trial, the court ordered that any statement of defendant made in connection with the polygraph test need not be furnished counsel, but if such a statement existed, the Attorney General should deliver it to the Court, to be sealed and included in the record on appeal. There is included in the record a sealed file with respect to a polygraph examination of one of the trial witnesses in the case, provided by Rivera but no file with respect to such an examination of defendant. We conclude that defendant has failed to show that such a file exists with respect to any statement made by defendant and this issue has no merit.

### XI.

■ Defendant complains that the State improperly argued certain facts that were not in evidence. However, we find evidentiary support for the arguments that the victim was "duped" into getting into patrol car number five voluntarily, and that she may have lived up to twenty-four hours after being struck in the head. We have examined the remaining complaints about the prosecution's argument alleged to be designed to make the jurors feel that they had a responsibility to the community to impose the death penalty and find no error therein.

### XII.

■ Defendant asserts that the prosecution was guilty of improper conduct at the sentencing hearing in characterizing defense counsel's opening statement as asserting that if the jury voted for the death penalty it would be, "guilty of the same demented, depraved mind of the person that committed this offense." The trial judge properly sustained defendant's objection to that argument. The prosecutor's remarks were an inaccurate interpretation of defense counsel's opening statement which the jury could easily recognize, and probably were detrimental to the State and beneficial to defendant. In any event, the trial judge's prompt sustaining of defendant's objection was adequate to cure that error which was insignificant in the context of this trial.

### XIII.

Defendant contends that the trial judge erred in denying his application for a continuance of the sentencing hearing on the

asserted grounds that defendant wanted to obtain expert testimony on the deterrent effect of capital punishment and on the issue of whether defendant's acts indicated depravity of mind.

■ Defendant failed to show that he had been diligent in seeking such expert testimony, that it would indeed be available, and when, and how defendant would be prejudiced if denied the continuance, which required a showing of the substance, materiality and relevancy of the testimony sought to be produced. Absent satisfactory evidence on those requirements, the trial judge properly exercised his discretion in denying the continuance. We have heretofore held that the deterrent effect of capital punishment is not relevant at the sentencing hearing. *State v. Johnson*, 632 S.W.2d 542 (Tenn.1982).

### XIV.

■ Defendant asserts that the trial judge was in error in failing to charge the eight mitigating circumstances set forth in T.C.A. § 39–2–203(j). Defendant presented no evidence relevant to any one of the eight statutory mitigating circumstances. It is defendant's position that the statute makes it mandatory that the trial judge charge and the jury consider the eight mitigating circumstances expressed in subsection (j), plus any other mitigating circumstances that are raised by the evidence. The plain language of the statute requires that trial judges instruct the jury to consider any mitigating circumstances which may be raised by the evidence at either the guilt or sentencing hearing, or both. In *State v. Buck*, 670 S.W.2d 600 (Tenn.1984), we held that it was error to charge any statutory mitigating circumstances that were not raised by the evidence at the guilt or sentencing hearing. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court implicitly recognized that only those mitigating circumstances that "the defendant proffers as a basis for a sentence less than death" are appropriate for consideration by the jury. *Id.* at 604, 98 S.Ct. at 2964–65.

Defendant asserts that there was evidence adduced at the guilt phase that defendant had cooperated with the police, and at the sentencing phase of defendant's "family obligations." Defendant contends that the trial court erred in refusing to expressly charge the jury that those factors were mitigating circumstances.

■ Assuming, without deciding, that there were non-statutory mitigating circumstances raised by the evidence, we find no provision in the death penalty statutes requiring that such factors be expressly charged. The only thing in the statutes relevant to defendant's contention under discussion is that mitigating circumstances are not limited to those expressly listed therein. T.C.A. § 39–2–203(j). Accordingly, we have held that the jury may consider any non-statutory mitigating circumstances, on its own initiative, and that there is no requirement that they reveal in their verdict what mitigating circumstances, if any, were considered. *State v. Melson*, 638 S.W.2d 342, 368 (Tenn.1982). Therefore, we hold that the only mandatory instructions with respect to mitigating circumstances are that those statutory circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other.

The trial judge's charge, with respect to mitigating circumstances, was as follows:

"You have now heard all of the evidence to be presented in this trial and the sentencing hearing of this case, including all of the evidence as to whether there were any aggravating circumstances, whether there were any mitigating circumstances, all of which you will carefully weigh and consider.

.... [The three statutory aggravating circumstances were charged.]

In arriving at the punishment, the jury shall consider, as heretofore indicated, any mitigating circumstances which shall include but not be limited to, the following: and that is any fact or circumstance you find is mitigating.

If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the State beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any sufficiently substantial mitigating circumstances, the sentence shall be death."

▇ We find that the trial judge's charge in this case met the requirements we hold to be mandatory and there is no merit to defendant's contention on this issue. While the charge did not include the phrase limiting mitigating circumstances to those that are raised by the evidence, that omission was favorable to defendant and he will not be heard to complain of its omission.

## XV.

Defendant contends that the evidence was insufficient to invoke the aggravating circumstance that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. We disagree.

▇ There was evidence that, although bludgeoned three times in the head, one blow knocking out three teeth, the victim may have lived for as long as twenty-four hours during which time she may have been tied between two trees; that defendant raped the victim after fatally wounding her; that the area where the crime was committed and the body left was remote dense woods that no persons other than hunters visited. Both the crude and vicious method used to murder the victim, and the leaving of a dying human being, tied up in an area where animals eventually disposed of her remains, chewed and scattered her bones over a large area, clearly made a jury issue of whether or not those acts met the test of the statutory aggravating circumstance of heinous, cruel or atrocious, involving torture or depravity of mind.

## XVI.

Defendant contends that the trial judge erred in refusing to allow him to introduce, at the sentencing hearing, evidence in support of his contention that he was innocent of the murder. In short, defendant asserted that he was entitled to rely on his alleged innocence as a mitigating circumstance.

▇ The death penalty statute provides that at the sentencing, "evidence may be presented as to any matter that the court deems relevant to the punishment." The issue of guilt or innocence is not relevant to punishment. The issue involved at the guilt phase of a bifurcated trial has been decided and is foreclosed if and when the sentencing phase of the trial begins. The trial court correctly held that the testimony tendered by defendant to attempt to convince the jury of his innocence was inadmissible at the sentencing hearing.

## XVII.

Defendant asserts that *State v. Melson, supra,* advances the idea that a jury may extend mercy to a defendant and that it follows that the trial judge was in error in failing to include an express charge to that effect. In responding to a preceding issue involving defendant's contentions with respect to the charge on mitigating circumstances, we have made it clear that such a charge would not be required.

## XVIII.

Defendant asserts error in the denial of his motion for a new trial on the grounds of newly discovered evidence, to-wit, the testimony of Nancy Liehr and Robert Rye.

Nancy Liehr would have testified that she believed she saw Kathy Nishiyama driving north on Highway 41A at approximately 9:30 p.m. on the night that she disappeared. Defendant did not meet the

test of showing that he exercised reasonable diligence prior to the trial to present the testimony of Nancy Liehr that was offered post-trial. Defendant's counsel had had the name, address and telephone number of Nancy Liehr for approximately five months prior to trial; had made some efforts to reach her himself, and had actually had someone who was assisting him in the defense of this case interview her. However, for some unexplained reason, that investigator did not discover that she would testify that she thought she saw Kathy Nishiyama at 9:30 p.m. on the date of her disappearance.

█ The second requirement for a new trial, on the basis of newly discovered evidence, is a showing that such evidence is likely to change the result. *State v. Goswick*, 656 S.W.2d 355 (Tenn.1983). In our opinion a jury would either reconcile Nancy Liehr's date or time of sighting the victim with the more convincing testimony of the witnesses who saw defendant standing beside her car near the church earlier and saw defendant driving south on Highway 48/13 at an earlier time, or simply reject her testimony out-of-hand.

█ Robert Rye would have testified that one evening between November 20 and November 25, 1981, he saw a young girl that looked like Kathy Nishiyama crossing a field near Tarsus Road in Montgomery County. He did not know Nishiyama, but had seen her picture on television and in the newspaper. It was almost dark and the witness was approximately three hundred yards away, although he would have testified that he was able to see the girl's face through the scope of his rifle. Pretermitting the factor of due diligence with respect to Rye's proffered testimony, we find it would not meet the requirements of the second prong of the two-fold test. Clear and convincing proof was presented of the character, habits and personal circumstances of Kathy Nishiyama, which were wholly inconsistent with the notion that she might run away from home or that she had any motivation for doing so. In our opinion, Rye's highly questionable identification of Kathy would have been rejected by a jury as irreconcilable with the overwhelming proof in this case.

## XIX.

█ Defendant asserts error in the admission of evidence that he was an inmate of the Dickson County Jail. The short answer to that issue is that he brought it upon himself by converting the county patrol car to his personal use in violation of the instructions of his jailors. His status was an inseparable part of the relevant and material proof in this case, unlike *State v. Scruggs*, 589 S.W.2d 899 (Tenn.1979), where the probation status of defendant was revealed to the jury under irrelevant circumstances.

## XX.

█ Defendant contends it was error to allow FBI Agent Cox to relate the statement of defendant that was not preceded by *Miranda* warnings. Cox testified that he became involved in the investigation shortly after Kathy disappeared although there was no evidence that a crime had been committed. We have heretofore related the circumstances under which Cox interviewed defendant. We think the admissibility of defendant's statement to Cox turns upon the question of whether or not defendant was *suspected* or *accused* of a crime at the time of Cox's interview. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The interview occurred seven days after Kathy disappeared, and the evidence of murder preceded by kidnapping was not discovered until over three months later. There was no focus upon defendant for the purpose of eliciting a confession, which is a basic posture that gives rise to a person's right to counsel and *Miranda* warnings. We find that in the totality of the circumstances of the Cox interview, *Miranda* warnings were not required and there was no error in the admission of Cox's testimony about the statements defendant made on that occasion.

We note that in December, General Atkins interviewed defendant, after giving *Miranda* warnings and in that clearly admissible statement substantially the same version of events was related, but in much greater detail.

### XXI.

Defendant contends that the trial judge, as thirteenth juror, should have granted a new trial because his response to a form question on the Rule twelve report reveals that the evidence did not foreclose all doubt respecting defendant's guilt.

Defendant insists that the trial judge's approval of the verdict as thirteenth juror was inconsistent with his negative response to the question on the Rule twelve form, "Although the evidence suffices to sustain the verdict, does it foreclose all doubt respecting the defendant's guilt?" We disagree.

■ A careful reading of the question reveals that there is no inconsistency. As thirteenth juror the trial judge must find that the evidence was sufficient to find the defendant guilty beyond a reasonable doubt. The question recognizes that the trial judge answering the form has sustained the verdict and thus has found the defendant guilty beyond a reasonable doubt, but asks the judge if the evidence satisfied the higher standard of foreclosing all doubt. There is no merit to this issue.

### XXII.

Defendant asserts a number of constitutional issues each of which has been dealt with by this Court in prior opinions and no further discussion thereof is warranted. *See generally State v. McKay and Sample,* 680 S.W.2d 447 (1984); *State v. Austin,* 618 S.W.2d 738 (Tenn.1981); *State v. Pritchett,* 621 S.W.2d 127 (Tenn.1981); *Houston v. State,* 593 S.W.2d 267 (Tenn. 1980).

We find no merit to the issues raised by defendant with respect to jury instructions and the denial of special requests for jury instructions. We have carefully considered all of the additional issues presented on appeal and found them to be without merit.

Pursuant to T.C.A. § 39–2–302 we have reviewed the sentence of death in this case and are of the opinion that it was neither excessive nor disproportionate to the penalty imposed in similar cases.

The conviction of murder in the first degree and the sentence of death are affirmed. The death sentence will be carried out on the 28th day of January, 1986, unless stayed by appropriate authority.

STATE VS HARTMAN

Not to Scale

BROCK, Justice concurring in part; dissenting in part.

With respect to the constitutionality of the death penalty, I adhere to the views expressed in my dissenting opinion in *State v. Dicks*, Tenn., 615 S.W.2d 126, 132 (1981); in all other respects I concur in the opinion of the Court.

OPINION ON PETITION TO REHEAR

A petition to rehear has been filed by appellant, Charles Edward Hartman, considered by the Court, found to be without merit, and is respectfully denied.

COOPER, C.J., and BROCK, HARBISON, DROWOTA, JJ., concur.