IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

# STATE OF TENNESSEE V. CHARLES EDDIE HARTMAN

**Direct Appeal from the Criminal Court for Montgomery County**
**No. 20101    Robert W. Wedemeyer, Judge**

---

**No. M1998-00803-CCA-R3-DD - Decided May 17, 2000**

---

The defendant, Charles Eddie Hartman, appeals his death sentence imposed by a Montgomery County jury at a resentencing hearing as punishment for felony first degree murder. This resentencing hearing was mandated by the Supreme Court of Tennessee as a result of the defendant's post-conviction proceeding. The following issues are presented for our review: (1) whether the state should have been required to file a bill of particulars on the aggravating circumstances; (2) whether the state wrongfully exercised peremptory challenges on the basis of race and/or gender; (3) whether the defendant was denied the right to introduce residual doubt testimony; (4) whether defendant was improperly prohibited from testifying about polygraph examinations; (5) whether the heinous, atrocious or cruel aggravating circumstance is constitutional; (6) whether the evidence was sufficient to sustain the aggravating circumstances found by the jury; (7) whether the prosecutor committed prosecutorial misconduct in closing argument; (8) whether the trial court's jury instruction on reasonable doubt was proper; (9) whether the trial court's instructions prohibited the jury from considering all mitigating evidence; (10) whether juror misconduct denied the defendant the right to a fair hearing; (11) whether the cumulative effect of errors necessitates a new hearing; (12) whether the death penalty unconstitutionally infringes upon the defendant's fundamental right to life; (13) whether defendant's lengthy stay on death row bars the state from carrying out the death penalty; (14) whether the death penalty statutes in this state are constitutional; and (15) whether the death penalty is disproportionate as applied to the defendant. After a careful review of the record, we affirm the imposition of the death penalty.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

RILEY, J. delivered the opinion of the court, in which GLENN, J. and ACREE, SPECIAL J. joined.

Richard McGee and John G. Oliva, Nashville, Tennessee, for the appellant, Charles Eddie Hartman.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Amy L. Tarkington, Assistant Attorney General; Joseph D. Baugh, Jr., District Attorney General Pro Tem; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

JUDGE RILEY delivered the opinion of the Court.

## PROCEDURAL HISTORY

Defendant was originally convicted in 1983 and sentenced to death for the 1981 murder of Kathy Nishiyama. Specifically, defendant was convicted of first degree murder in perpetration of kidnapping. The conviction and sentence were affirmed by the Supreme Court of Tennessee on direct appeal. State v. Hartman, 703 S.W.2d 106 (Tenn. 1985), *cert. denied* 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986).

Subsequently, defendant sought post-conviction relief raising numerous issues. Ultimately, the Supreme Court of Tennessee found all issues to be without merit with the exception of the use of felony murder as an aggravating circumstance. Based upon this error, the case was remanded for resentencing. Hartman v. State, 896 S.W.2d 94 (Tenn. 1995).

The resentencing hearing was conducted in July-August 1997. The jury imposed the death penalty based upon the following aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution of the defendant; and (3) the murder was committed while defendant was in lawful custody or during his escape from lawful custody. *See* Tenn. Code Ann. § 39-2404(i)(5), (6) and (8) (Supp. 1981). This appeal followed.

## TESTIMONY AT RESENTENCING HEARING

Much of the evidence at the resentencing hearing was repetitive of the evidence introduced in the original trial. Nevertheless, we will summarize the evidence presented at resentencing since the resentencing jury did not hear the evidence presented at the original trial.

A. State's Proof

The victim, Kathy Nishiyama, was a sixteen-year-old high school student. On November 16, 1981, she visited her boyfriend and left his residence at approximately 8:00 p.m. The victim did not return to her residence. Her car was discovered at approximately 11:00 p.m. that night in the parking lot of a church near her residence.

The victim's purse was found on February 24, 1982, about thirty feet down an embankment near Highway 49. Approximately one week later the victim's body and personal belongings were found about three miles from this location on a logging road that led into the woods off the main state road. The victim's car keys were found in her purse. The victim's clothes were found in the area near her remains, and her jeans had been cut from the waist down the right pant leg. The victim's panties were also cut from the waistband on the right side consistent with the cut on the jeans. There was also a hole cut about an inch in diameter in the crotch of the victim's panties. The cuts on the clothes were

consistent with a single-bladed instrument, like a knife. Authorities also discovered two trees about eight feet apart that had scars consistent with a rope having been tied around them.

On November 16, 1981, the date of the victim's disappearance, the defendant was a trusty at the Dickson County jail. That afternoon he assisted a deputy sheriff with his tobacco crop. The deputy instructed the defendant to drive the patrol car back to the Dickson County jail. Defendant did not return to the jail until the early morning hours of November 17th.

Richard Hughes testified that a patrol car pulled him over in Montgomery County around 6:30 p.m. on November 16th. The man in the patrol car, who was not in uniform, told Hughes he was lost and needed directions to Dickson County.

Betty Smith also testified that a patrol car stopped her and her minor daughter around 7:30 p.m. that same evening. The man driving the car stated he was ordered to follow Smith because she was suspected of being involved in a hit and run incident. Smith testified the man was not in uniform and had long hair. The man also shined a flashlight at her and her daughter. Smith showed him her license, and then he let her go. Both Smith and her daughter identified the man in the patrol car as the defendant.

Terry Keyster Taylor was unavailable at the resentencing hearing so his prior trial testimony was read into the record. That testimony indicated he was stopped in Montgomery County by a patrol car during the evening of November 16th. The man in the patrol car was not wearing a uniform and said he was lost and needed directions to Dickson County. Taylor identified the man driving the patrol car as the defendant.

About 8:20 p.m. on November 16th, Deputy William Randy Starkey of the Dickson County Sheriff's Department received a dispatch from Montgomery County inquiring if Dickson County had a marked patrol car in Montgomery County. The Montgomery County authorities had been receiving complaints about a man driving a patrol car in plain clothes stopping people in Montgomery County.

Roger Meckley, a former detective with the Clarksville Police Department, and Danny Bryant both testified they saw an out-of-county patrol car driving in Clarksville between 9:00 p.m and 9:30 p.m. the night of November 16th. Meckley testified the driver was wearing a green military-style jacket.

Around 9:30 p.m. on November 16th, Jackie Jackson observed a county patrol car parked behind a brown car in the church parking lot where the victim's car was ultimately found. Neither car was running or had its lights on. Jackson saw a white male, not in uniform, with shoulder length hair standing between the two cars. Jackson was not certain if the patrol car was from Dickson County. However, according to dispatch records, none of the Montgomery County officers on duty that night stopped a car in the vicinity where the victim's car was found.

Marvin Rushing testified that between 1:00 a.m. and 2:00 a.m., sometime in mid-November

1981, he saw a Dickson County Sheriff's patrol car drive onto the main state road from the side logging road where the victim's remains were found. The patrol car turned toward Dickson.

Deputy Starkey testified that on November 17th, when he observed the patrol car driven by the defendant, he noticed mud on the bottom of the car and also a smeared substance that appeared to be blood on the right rear quarter panel. Deputy Howard Arthurs also noticed what appeared to be a blood smear on the patrol car on November 18th. Deputy Starkey testified the defendant cut his hair significantly shorter within about a week after November 16th.

Dickson County Sheriff Doyle Wall testified the defendant returned to the jail about 4:00 a.m. on November 17th. Defendant was wet from his knees down.

Former Assistant District Attorney General James Kenneth Atkins interviewed the defendant in jail on December 17, 1981. The defendant admitted that he stopped two cars while he was returning to the jail in the patrol car. According to the defendant, neither was driven by a female. He claimed he was lost; however, he stated that he did not go into Clarksville, which is where the victim's car was found. The defendant stated he did not stop the victim that night. He claimed he got the patrol car stuck in a creek bed, hence his late return to the jail.

Dr. William M. Bass, Forensic Anthropologist for the State of Tennessee, identified the skeletal remains found in the woods as those of the victim. He testified that the victim suffered a blow to the mouth breaking three teeth. The victim also suffered a blow to the left eye, thereby fracturing the skull, a separate blow to the center of the head, and a massive blow to the right side of the head caving in the skull near the ear. The force from this latter blow also caused fracturing in the rear of the skull and was the fatal injury. All of the injuries to the head occurred at or near the time of death; however, Dr. Bass could not determine whether the victim was conscious when the blows were inflicted. Nor could Dr. Bass determine the date or time of death. Dr. Bass opined that the blow to the right side of the head would have rendered the victim unconscious. Dr. Bass, however, could not determine the order of the blows, nor could he opine as to how long the victim would have lived after receiving the fatal blow to the right side of the head.

B. Mitigating Evidence

The defendant presented the following proof on his behalf. Nancy Ann Perez, a friend of the victim, gave a statement to the authorities in 1982 that she saw the victim driving in her vehicle in Clarksville around 9:45 p.m. the night of November 16, 1981. However, she later testified that she could only identify the victim's car that night and could not determine who was driving. Perez testified that several days later she saw a car similar to the victim's driven by another student at her school.

Sometime between November 20 and 25, 1981, around 4:00 p.m. in the afternoon, William Robert Rye observed a female similar in appearance to the victim walking at a fast pace across a soybean field near Houston, Montgomery and Dickson Counties. He was later shown a photograph of the victim and stated that the female he saw looked like the victim, but he could not make a positive

-4-

identification. Rye observed the person through a rifle scope at a distance of about 150 to 200 yards.

Roger Dale Sanker, former head of criminal investigation for the Dickson County Sheriff's Department, testified that on November 18, 1981, he examined the patrol car the defendant drove on November 16th. Sanker testified that he did not observe any blood on the inside or outside of the patrol car. Another deputy approached Sanker about a blood smear on the car, but Sanker testified the stain was not there when he examined the car on the 18th.

Sheriff Wall testified that he examined the defendant after the defendant returned to the jail around 4:00 a.m. on November 17, 1981. The defendant was wet from his knees down, but Wall did not see any blood on the defendant or his clothing. Wall also testified that he did not observe any blood on the inside or outside of the patrol car when he looked at it on November 17th. He did state that the car was covered with a "red clay mud." Wall also stated that the defendant was taken to get his hair cut about one to two weeks after the crime.

In addition the defendant presented numerous witnesses who testified about his personal history and positive qualities. These witnesses consisted of various family members, a Catholic Church deacon, a Baptist minister, various family friends, a former high school teacher, and several correctional officers. The defendant was portrayed as having a close relationship with his family. Church officials described defendant as a very spiritual person. Family friends spoke of defendant's childhood and positive qualities. Defendant's former high school teacher and coach described defendant as a leader on the football and basketball teams and a "tough competitor." Numerous correctional officials testified as to their relationship with the defendant during his lengthy period of incarceration. Defendant was described as a good worker, respectful, positive in attitude, well behaved, and a good representative on the Inmate Council.

C. Jury Verdict

The jury found three applicable aggravating circumstances; namely: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution of the defendant; and (3) the murder was committed while the defendant was in lawful custody or in a place of lawful confinement or during his escape from lawful custody or from a place of lawful confinement. *See* Tenn. Code Ann. § 39-2404(i)(5), (6) and (8) (Supp. 1981). The jury concluded the statutory aggravating circumstances outweighed any mitigating circumstances and imposed the death penalty.

**BILL OF PARTICULARS**

In his first issue the defendant contends the trial court erred in failing to order a bill of particulars requiring the state to provide more specific information on the aggravating circumstances. Tenn. R. Crim. P. 7(c) authorizes a trial court to require the filing of a bill of particulars to adequately identify the offense charged. However, this provision is not applicable to the sentencing phase of a capital proceeding. State v. Bush, 942 S.W.2d 489, 520 (Tenn. 1997)(Appendix). We conclude the identification of the aggravating circumstances was sufficient notice to the defendant, and he was not

prejudiced by the failure to provide further information.

## IMPROPER PEREMPTORY CHALLENGES

The defendant next claims that the state violated his right to a fair jury by improperly using its peremptory challenges to strike African-American female jurors from the jury. *See* Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During jury selection, the state used its peremptory challenges to remove three out of four African-American females from the venire. The trial court, after hearing from the state, determined that the state offered race and gender neutral bases for its challenges. The jury in this case ultimately included four females and two African-Americans, one of which was female.

The defendant challenges the trial court's findings on his claim. According to the defendant, some of the jurors who were not struck by the state shared similar views or characteristics as the three African-American women who were challenged. The defendant argues, therefore, that the state's reasons for striking these three jurors were "surrogates for impermissible use of the state's peremptory strikes."

The state explained that it first rated each juror based upon juror questionnaires. A number of factors were considered without regard to gender or race. The state then explained its rationale for excusing the three jurors.

According to the state, prospective juror Nelson had a son who experienced some juvenile problems. She also stated that she could not conceive of a case in which she would vote for imposing the death penalty. Furthermore, the state did not perceive Nelson to be intelligent.

The state explained that prospective juror McCoy was ambiguous about criminal justice. She stated she could not impose the death penalty and would only do so if forced by the law. According to the state, she expressed some reservations about the aggravating circumstances being sought.

Prospective juror Brown's husband taught school with one of the prosecutor's spouse. According to the spouse, juror Brown would not be a good juror. Juror Brown also stated it would be difficult to impose the death penalty in a murder case. The state also offered that Brown previously worked in a military stockade.

After hearing the state's explanations and the defendant's comments that some of the jurors who were not struck shared similar characteristics, the court stated as follows:

> [I]t's the Court's opinion that on each of these jurors, despite the fact that there are some similar responses from other jurors who were not challenged on some of the issues, there are, in the Court's opinion, both race neutral and gender neutral reasons that were fairly clearly articulated by General Baugh with regard to each of these three

> individuals. . . . I do feel that the state has stated race neutral reasons for using the peremptories that were used.

The determination of a prosecutor's discriminatory intent or lack thereof depends largely upon the trial court's evaluation of the prosecutor's credibility. State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992). Thus, we give appropriate deference to the trial court's findings. Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991); State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994).

We likewise conclude the state advanced gender and race neutral reasons for its peremptory challenges. This issue is without merit.

## RESIDUAL DOUBT EVIDENCE

Defendant claims the trial court improperly prevented him from presenting residual doubt evidence during the resentencing trial. The trial court did permit "residual doubt" evidence in allowing the testimony of witnesses Perez and Rye. Their testimony essentially indicated they might have seen the victim after the time the state contended the defendant had murdered her. This testimony clearly related to the circumstances of the offense. However, the trial court disallowed evidence relating to the state's offer of benefits at the original trial for Ravin "Snake" Frazier, which was not revealed to defense counsel at the time of the original trial. Defendant contends the trial court erred in refusing to allow evidence relating to the credibility of Frazier's testimony at the original trial.

A. Facts

Although the trial court disallowed this testimony before the jury, defendant was properly allowed to make an offer of proof. A summary of this offer of proof is as follows.

Frazier testified at the original trial that the defendant made a number of incriminating statements to him while they were incarcerated. Subsequent to the original trial, defense counsel discovered that certain prosecuting attorneys had conferred with defendant's cellmate Kenny King and inmate Frazier prior to trial. It was agreed that King would record a conversation with the defendant and would be paid $1,000. Although King never recorded any of defendant's statements, Frazier advised the prosecutors that he had heard the defendant make incriminating statements and agreed to testify. The $1,000 was deposited into King's prison account with part of the money coming out of the personal funds of certain prosecutors.

The prosecutors insisted the "reward" money was for King only, and there was no agreement that money would be paid to Frazier. One of the prosecutors further testified that, prior to agreeing to pay the money, he contacted the Tennessee Bureau of Investigation and was informed the reward money would be repaid by the TBI. Regardless, none of this information was revealed to defense counsel prior to the original trial.

King did not testify at the original trial; however, Frazier did testify. Neither King nor Frazier testified at the resentencing hearing.

The trial court concluded that the proffered evidence was impeachment evidence relating to Frazier's testimony at the original trial. The court further noted that Frazier did not testify at the resentencing hearing, and this testimony would be introduced for the sole purpose of impeaching the first jury's verdict of guilt. The trial court disallowed its introduction, finding the evidence did not relate to punishment.

This issue was litigated in defendant's post-conviction proceeding. Ultimately, the Tennessee Supreme Court concluded that the only promise made to Frazier was protection from other inmates, which was fully explored at the original trial during Frazier's cross-examination. Hartman, 896 S.W.2d at 102. Although the court noted that "any evidence that Frazier had been ... given any benefit whatsoever for his testimony should have been provided to defense counsel," the court went on to hold that the failure to disclose this information was immaterial and did not deprive the defendant of a fair trial. *Id*. at 101-102.

B. Residual Doubt Precedents

A capital sentencing jury may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any other circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, the United States Supreme Court has not mandated reconsideration by capital juries, in the sentencing phase, of their "residual doubt" over a defendant's guilt since it does not relate to the defendant's character, record or to the circumstances of the offense. Franklin v. Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). We note that in the direct appeal of the defendant's conviction and sentence in the case at bar, the Tennessee Supreme Court held that "the testimony tendered by defendant to attempt to convince the jury of his innocence was inadmissible at the sentencing hearing." Hartman, 703 S.W.2d at 119.

The Tennessee Supreme Court again addressed the so-called "residual doubt" issue in State v. Teague, 897 S.W.2d 248 (Tenn. 1995). The court stated the following:

> [T]he holding in those cases, that the defendant cannot relitigate the issue of guilt or innocence, does not preclude the admission of evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate a defendant's culpability by showing that he actually did not kill the victim. The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances. That the evidence may support the defendant's contention that he did not kill the victim does not render it inadmissible so long as it is probative on the issue for determination, the defendant's punishment. . . . Evidence that is admissible as being relevant to the issue of guilt or

-8-

innocence may also be admissible at a resentencing hearing in support of a mitigating circumstance. One example would be testimony by a witness that the defendant did not fire the shot that killed the victim.

Teague, 897 S.W.2d at 252.

C. Analysis

Our research reveals no case involving the issue of the admissibility of evidence at a resentencing hearing when its sole purpose is to attack the credibility of a state witness's testimony at the original trial. The dilemma faced by the trial court at the resentencing hearing was forecast by the United States Supreme Court:

Finding a constitutional right to rely on a guilt-phase jury's "residual doubts" about innocence when the defense presents its mitigating case in the penalty phase is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentence – but not the underlying conviction – is struck down on appeal. (citations omitted)

Franklin, 487 U.S. at 173 n.6. Such is the dilemma we face in the case at bar: the problems inherent in allowing testimony before a resentencing jury which relates solely to impeaching a witness who testified only at the original trial, since the resentencing jury did not participate in the original trial in which guilt was determined. The resentencing jury in this case did not hear the testimony of Frazier.

We can only conclude that evidence at a resentencing hearing which would be admitted for the sole purpose of attacking the credibility of a witness' testimony at the original trial is not proper residual doubt testimony. It is not testimony that relates to the defendant's character or record or to the circumstances of the offense. *See* Lockett, 438 U.S. at 604. Furthermore, we do not read our Supreme Court's opinion in *Teague* to authorize such testimony. *Teague* authorizes testimony relating to "punishment," which is testimony relating to the "circumstances of the crime or the aggravating or mitigating circumstances including evidence which may mitigate a defendant's culpability by showing that he actually did not kill the victim." Teague, 897 S.W.2d at 252. The proffered evidence does not fit these criteria.

We recognize that it is arguable that it is simply unfair that neither jury heard this evidence. We agree that this evidence, without question, should have been revealed to defense counsel prior to the original trial. The proffered evidence certainly would have been presented at the original trial if defense counsel had known of it. However, that is not the issue before this court.

The defendant has not been deprived of the right to litigate this issue. Although in a different context, the exact issue was thoroughly litigated in defendant's post-conviction proceeding. The essence of the Supreme Court's ultimate ruling was that "the failure of the state to disclose this information to defense counsel did not in any way deprive the [defendant] of a fair trial." Hartman, 896

S.W.2d at 102. In so ruling the court noted "the circumstantial evidence against [defendant] was strong, even without [Frazier's] testimony." *Id.* at 101. We agree.

This issue is without merit.

## POLYGRAPH EXAMINATIONS

Defendant claims the trial court erred by excluding the results of his two polygraph tests. He argues that even though polygraph results are generally inadmissible in Tennessee, such evidence should not be excluded when it is offered at a capital resentencing hearing under the mitigation theory of residual doubt. *See* Teague, 897 S.W.2d at 252-53. Defendant argues this is especially true when the test was administered by the state. He contends such a rule comports with the principles of individualized sentencing.

In addition the defendant claims the trial court's error was compounded by the state's introduction of defendant's statement to the Assistant District Attorney, in which all references relating to defendant's offer to take a polygraph test were redacted. Defendant claims Tenn. R. Evid.106 requires the trial court to allow defendant to introduce the entire statement.[1]

### A. Mitigation

In Irick v. State, 973 S.W.2d 643, 652-53 (Tenn. Crim. App. 1998), a case dealing with admissibility of polygraph results at a capital sentencing hearing, this court upheld the long standing precedent ruling polygraph tests inadmissible and "inherently unreliable." See State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App. 1995); State v. Adkins, 710 S.W.2d 525, 529 (Tenn. Crim. App. 1985). This court concluded that under the death penalty statute the "results of a polygraph test would have no probative value on the issue of punishment." Irick 973 S.W. 2d at 653.

Defendant claims that when polygraph evidence is introduced in the context of residual doubt proof, a different standard for admissibility is applied. He argues that evidence which may mitigate a defendant's culpability should be introduced. *See* Teague, 897 S.W.2d at 252-53.

While we agree that in capital sentencing the general prohibition against re-litigation of guilt or innocence does not bar evidence tending to mitigate defendant's culpability, such evidence is admissible only if "it is probative on the issue... [of] defendant's punishment." *Id.* at 252. Since the

---

[1] Tenn. R. of Evid. 106 reads as follows:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statements which ought in fairness to be considered contemporaneously with it.

-10-

"results of a polygraph test would have no probative value on the issue of punishment," this issue is without merit. *See* Irick, 973 S.W.2d at 652.

### B. Rule of "Completeness"

Secondly, we conclude the trial court did not abuse its discretion by refusing to allow defense counsel to admit defendant's statement in its entirety.[2] The trial court found that "there [was] no question Mr. Hartman... said numerous times... he was not involved." Thus, the trial court concluded additional evidence that "he offered to take a polygraph, which has already been ruled [inadmissible]," was cumulative and not required.

Rule 106 requires the complete statement to be admitted when "fairness" so dictates. The determination as to what "fairness" requires is left to the discretion of the trial judge. N. Cohen *et al.,* **Tennessee Law of Evidence** § 106.1. (3d ed. 1995). Thus, we will not disturb the trial court's ruling absent an abuse of discretion.

In a similar case in which the defendant sought to introduce his entire statement, this court concluded that a defendant's willingness to take a polygraph test was irrelevant and inadmissible. Adkins, 710 S.W.2d at 528-529. We further conclude that "fairness" did not dictate the admission of this evidence in view of defendant's statement. The trial court did not abuse its discretion in denying introduction of this evidence.

### HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING CIRCUMSTANCE

Next, defendant contends the heinous, atrocious or cruel aggravating circumstance is unconstitutional as applied in his case. The applicable statute defined the aggravating circumstance as follows: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2404(i)(5) (Supp. 1981).[3] The Tennessee Supreme Court subsequently adopted certain definitions of these terms to be utilized in future cases. State v. Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985). These definitions were utilized at the resentencing hearing, and defendant contends such instructions were an *ex post facto* violation.

The pre-1989 version of this aggravating circumstance has repeatedly been found to be

---

[2] At trial the defendant's statement to the Assistant District Attorney was read into the record. In accordance with the trial court's prior ruling denying the admission of defendant's polygraph results, portions of the statement dealing with defendant's offer to take a polygraph exam were redacted.

[3] The statute was subsequently amended so that it presently provides: "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (Supp.1999).

constitutional by the Tennessee Supreme Court. State v. Middlebrooks, 995 S.W.2d 550, 556 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998). Use of the *Williams* definitions in conjunction with this aggravating circumstance has been specifically approved. Middlebrooks, 995 S.W.2d at 556. Defendant's argument that our Supreme Court's rulings are inconsistent with United States Supreme Court's decisions has been rejected by the Tennessee Supreme Court. *Id.* at 557. We further note that defendant's argument was rejected in the post-conviction appeal. Hartman, 896 S.W.2d at 106.

We further conclude there is no *ex post facto* violation. The jury was properly instructed in accordance with the aggravating circumstance in existence at the time of the commission of the crime. The trial court simply added definitions suggested by *Williams*. In fact, the Tennessee Supreme Court in the post-conviction appeal remanded to the trial court with specific instructions to "adhere to the *Williams* holding if its instructions at resentencing include information regarding this aggravator." Hartman, 896 S.W.2d at 106.

Defendant also contends it is impossible to determine whether the jurors unanimously agreed upon whether the murder was heinous, atrocious or cruel since these elements are in the disjunctive form. This is one aggravating circumstance, and there is no requirement that the jury specify any particular prong. *See generally* State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999); State v. David M. Keen, C.C.A. No. 02C01-9709-CR-00365, Shelby County (Tenn. Crim. App. filed February 10, 1999, at Jackson). This issue is without merit.

## SUFFICIENCY OF EVIDENCE RELATING TO AGGRAVATING CIRCUMSTANCES

Defendant contends the evidence was insufficient to support the jury's findings of the aggravating circumstances. In determining whether the evidence is sufficient to support the application of aggravating circumstances, we must view the evidence in a light most favorable to the state. *See* State v. Nesbit, 978 S.W.2d 872, 886 (Tenn. 1998); Williams, 690 S.W.2d at 530. We conclude the evidence is sufficient to support each aggravating circumstance.

A. Heinous, Atrocious or Cruel

The evidence indicates the sixteen-year-old victim left her car and got in the patrol car where she was driven by the defendant several miles to a remote area off the highway. She was unmercifully beaten, having been hit in the mouth with sufficient force to break three teeth. She was bludgeoned three times in the head, with one massive blow caving in her skull. Her jeans had been cut from the waist down the right pant leg; her panties were cut consistently with the cut on her jeans; a small hole was cut in the crotch of her panties; and all cuts appeared to have been made with a bladed instrument, like a knife. Evidence further indicated that the victim had been tied between two trees. She was left in the remote area with her remains to be scavenged by wild animals.

We conclude there was more than sufficient evidence for the jury to find the murder was (1) "especially heinous," since it was grossly wicked and reprehensible; (2) "atrocious," since it was

-12-

monstrous as well as extremely evil and cruel; (3) "cruel," since the defendant's acts were intended to inflict severe pain and suffering; (4) involved "torture," since the jury could reasonably infer that the defendant inflicted severe physical and mental pain upon the victim while she was conscious; and (5) involved "depravity of mind," since the acts of the defendant were indeed wicked and perverse. *See* Williams, 690 S.W.2d at 529 (defining these five terms in a manner consistent with our analysis).

B. Avoiding Arrest or Prosecution

The victim was taken by the defendant from the location of her car to a remote area. Although we do not know the circumstances of how defendant got her into the patrol car, she was ultimately held against her will. Indeed, the defendant stands convicted of murder in perpetration of kidnapping. She would have been able to identify the defendant and report the kidnapping as well as his unlawful conduct relating to his use of the patrol car.

In order to establish this aggravating circumstance, the state need prove only that avoidance of prosecution or arrest was "one" of the purposes motivating the killing. State v. Pike, 978 S.W.2d 904, 918 (Tenn. 1998); State v. Bush, 942 S.W.2d 489, 504 (Tenn. 1997). Viewing the evidence in a light most favorable to the state, the jury could reasonably infer that one purpose of the murder was to prevent the victim from identifying him as the person engaged in unlawful activities prior to the homicide itself. Accordingly, this issue is without merit.

C. Lawful Custody

The defendant was serving a sentence at the Dickson County jail. He accompanied a deputy sheriff, performed work, and was ordered to drive the patrol car back to the jail. Instead, the defendant remained at large for several hours during which time he committed this offense.

In the post-conviction appeal the Tennessee Supreme Court concluded that the defendant "was in the constructive custody of the Dickson County Sheriff's Department at the time the victim disappeared. The meaning of this circumstance and its application to the proof presented in this case is certain." Hartman, 896 S.W.2d at 104. The evidence was sufficient for the jury to reach the same conclusion at the resentencing hearing.

## PROSECUTORIAL MISCONDUCT

Defendant contends the state made several improper remarks during closing argument. Specifically, defendant attacks the prosecutor's references to (1) the circumstances surrounding defendant's trusty status at the Dickson County jail; (2) defendant's pretrial statement to Assistant District Attorney Atkins as a "confession;" (3) the kidnapping of the victim; (4) the prosecutor's family status; (5) the defendant as a "predator;" and (6) the need to protect society.

Firstly, we note there was no contemporaneous objection to any of these arguments. Accordingly, the issue is waived. Tenn. R. App. P. 36(a); State v. Keen, 926 S.W.2d 727, 736 (Tenn.

-13-

1994). Nevertheless, we will address these arguments.

Closing argument is subject to the trial court's sound discretion. <u>Middlebrooks</u>, 995 S.W.2d at 557. Counsel should be permitted wide latitude in arguing the case to the jury. <u>State v. Bigbee,</u> 885 S.W.2d 797, 809 (Tenn. 1994). Argument should be tempered, based upon evidence introduced during trial, relevant to the issues being tried, and not otherwise improper. <u>Keen</u>, 926 S.W.2d at 736.

A. <u>Reference to Trusty Status</u>

Defendant complains of the prosecutor's (1) reference to the defendant as a trusty at the Dickson County jail who was given that status for the purpose of working for the sheriff and others; (2) reference to defendant's domestic altercation with his wife; and (3) reference to the defendant receiving unequal treatment at the jail. In the context of the argument, we find no entitlement to relief. The essence of the argument was to explain how the defendant, as an inmate, was able to secure possession of the patrol car. The reference to the domestic altercation was brief and was in an effort to explain the inappropriate action of the Dickson County Sheriff's Department in allowing defendant his status. These arguments do not entitle defendant to relief.

B. <u>Reference to Confession</u>

Defendant contends the prosecutor improperly characterized his pretrial statement to Assistant District Attorney General Atkins as a "confession." The characterization was inaccurate; however, the prosecutor went on to argue that "what you know is more damning to him than any confession you could find." Defendant was not prejudiced by this argument.

C. <u>Reference to Kidnapping</u>

Defendant contends the state improperly referred to the kidnapping of the victim since the Tennessee Supreme Court in the post-conviction appeal held the state could not utilize felony murder in perpetration of kidnapping as an aggravating circumstance. <u>Hartman</u>, 896 S.W.2d at 103. The court held only that felony murder based upon kidnapping could not be used as an aggravating circumstance since it duplicated an element of felony murder used for the conviction. *See* <u>Middlebrooks</u>, 840 S.W.2d at 346. The ruling in no way implies that the state could not refer to the kidnapping of the victim. Felony murder in perpetration of kidnapping was, after all, the conviction offense. This issue is without merit.

D. <u>Personal References</u>

Defendant attacks the prosecutor's reference in final argument to his own status as a father. The prosecutor made the reference in explanation of how teenage females are protective of their automobiles, which explains why the victim parked her car in its location in the parking lot. We agree the reference was improper; however, we are satisfied the reference had no effect on the verdict.

E.  Predator Reference

Defendant contests the prosecutor's reference to him as "a predator, it's like a lion waiting at a water hole for a helpless victim. And he's sitting in a patrol car, and he's waiting on her." Generally, name-calling in final argument is inappropriate. State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (finding the prosecutor's reference to the defendant as a "rabid dog" and other objectionable references to be harmless error). The prosecutor's reference in this case, when taken in context, was not prejudicial to the defendant.

F.  General Deterrence

Defendant next complains of the prosecutor's personal reference to his Army experience and the need to have protection against enemies in the same fashion that jurors need to protect society. Any final argument based upon general deterrence is inappropriate at a capital sentencing hearing. State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988). The argument was improper.

In determining whether the argument creates reversible error, we must consider (1) the questioned conduct in light of the facts and circumstances of the case; (2) curative measures undertaken by the court or prosecution; (3) the intent of the prosecutor; (4) the cumulative effect of improper conduct; and (5) the relative strength and weakness of the case. State v. Nesbit, 978 S.W.2d 872, 894 (Tenn. 1998). Viewing the questioned argument in light of these five factors, we conclude the argument did not affect the verdict to the prejudice of the defendant.

**JURY INSTRUCTION – REASONABLE DOUBT**

Defendant contends the "reasonable doubt" jury instruction containing "moral certainty" language was improper. This contention has been rejected by our courts. State v. Hall, 976 S.W.2d 121, 159 (Tenn. 1998) (Appendix); Carter v. State, 958 S.W.2d 620, 626 (Tenn. 1997).

**JURY INSTRUCTION – MITIGATING CIRCUMSTANCES**

Defendant contends the trial court erred in refusing to instruct the jury on several specific non-statutory mitigating circumstances. The trial court denied several requests which summarized various witnesses' testimony as "residual doubt" evidence. Rather than granting these requests, the trial court gave a general instruction. The general instruction authorized the jury to consider "[a]ny residual or lingering doubts you may have about Mr. Hartman's participation in the commission of the offense. Residual doubt means doubt somewhere between reasonable doubt, as defined herein, and absolute certainty of guilt." The trial court also instructed the jury that they could consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense throughout the entire sentencing hearing." The court further instructed the jury that no distinction was to be made between specific mitigating circumstances charged and the "catch-all" mitigating circumstances.

Since the offense was committed prior to November 1, 1989, there was no requirement that the trial court charge specific non-statutory mitigating circumstances.  State v. Smith, 993 S.W.2d 6, 32 (Tenn. 1999) (Appendix); Hartman, 703 S.W.2d at 118.  Regardless, the trial judge did instruct on three specific non-statutory mitigating circumstances in addition to the "catch-all" instruction.  We further conclude the trial court did not err in giving a general instruction regarding "residual doubt" testimony rather than the specific instructions requested by defendant.  This issue is without merit.

## JUROR MISCONDUCT

A.  Factual Background

The jury was selected on a Friday, not sworn, and, by agreement, was not sequestered over the weekend.  However, the jury was given detailed instructions concerning their conduct, including an instruction not to allow any person to discuss the case with them.  On the following Monday, the judge asked the jurors if any person had talked to them about the case "before you could tell them to be quiet."  No juror responded; the jury was sworn; and the trial proceeded.

Subsequent to trial defense counsel discovered that juror Eddie Card had a conversation with Don Smith, the husband of witness Betty Smith, after jury selection and prior to the start of trial.  Defendant's investigator testified at the motion for new trial that he interviewed juror Card.  Card knew nothing about the facts of the case prior to jury selection since he had relocated in Tennessee subsequent to the commission of the offense.  The investigator testified that the juror admitted seeing Don Smith on the Saturday after jury selection; he advised Smith that he was on a sequestered jury; Smith responded that his wife was involved in the case; and the matter was not discussed further.  The investigator further testified that he spoke with other jurors "to see if anybody was aware that Mr. Card had been a friend of the Smiths or if he had made any comments to them."  The investigator did not testify that Card made such comments to other members of the jury.

The affidavit of juror Card was filed.  The affidavit indicated that the juror played pool with Don Smith on that Saturday; he told Smith he was on a sequestered jury; Smith responded that his wife and daughter had been stopped by the defendant; the juror advised Smith that he could not discuss the case; and no further conversation took place.  The affidavit further indicated that the juror knew nothing about the case prior to the resentencing hearing since he had relocated in Tennessee after the crime.  The affidavit of TBI Agent Anthony Clark indicated he interviewed juror Card and was given the same information as Card set forth in his affidavit.

The trial court denied relief.  Specifically, the trial court found no evidence of bias on the part of the juror, nor a failure of the juror to obey the court's admonitions.  The court concluded the defendant was not deprived of a fair trial.

B.  Analysis

If a juror has been exposed to extraneous prejudicial information, there arises a rebuttable

presumption of prejudice with the burden shifting to the prosecution to explain the conduct or to demonstrate its harmlessness. State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). We conclude the information imparted to juror Card was extraneous information sufficient to shift the burden to the state to demonstrate its harmlessness. *See* State v. Blackwell, 664 S.W.2d 686, 688-89 (Tenn. 1984). Furthermore, the failure of juror Card to disclose the conversation with Smith when the jury was asked by the trial court if anyone had talked to them about the case creates a presumption of prejudice. State v. Akins, 867 S.W.2d 350, 355-56 (Tenn. Crim. App. 1993). Thus, we must determine whether the state has carried its burden in showing the harmlessness of this contact.

The nature of the extraneous information was that Mrs. Smith and her daughter were stopped by the defendant. Both Mrs. Smith and the daughter testified at trial to this fact. Most importantly, the testimony of Mrs. Smith and her daughter was undisputed. Defendant's action in stopping them was conceded in final argument. We conclude the state has met its burden of establishing no prejudice as a result of juror Card's receipt of the extraneous information.

## CUMULATIVE EFFECT OF ERRORS

Defendant contends the cumulative effect of errors necessitates a new trial. *See* State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996). Our review of the record reveals no errors that prejudiced the defendant.

## FUNDAMENTAL RIGHT TO LIFE

Defendant contends the death penalty unconstitutionally infringes upon his fundamental right to life. This argument has been rejected by our courts. *See* State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997) (Appendix).

## DEATH ROW

Defendant contends his stay on death row since 1983 renders his death penalty cruel and unusual punishment, especially since the death penalty imposed at the first trial was vacated. He relies upon memoranda in *certiorari* denials in Elledge v. Florida, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998), and Lackey v. Texas, 514 U.S. 1054, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995). Finding no authority supporting defendant's contention, we conclude the issue is without merit.

## CONSTITUTIONALITY OF DEATH PENALTY STATUTES

Defendant contends the death penalty statutes in Tennessee are unconstitutional. Constitutional attacks upon Tennessee's death penalty statutes have consistently been denied. *See* State v. Cazes, 875 S.W.2d 253, 268-69 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn. 1993); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 185, 187 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990); State v. Melson, 638 S.W.2d 342, 366, 368 (Tenn. 1982); State v. Groseclose, 615 S.W.2d 142, 150 (Tenn. 1981). This issue is without merit.

## PROPORTIONALITY REVIEW

A comparative proportionality review must be undertaken in capital cases pursuant to Tenn.Code Ann. § 39-13-206(c)(1)(D) (1997). In conducting a comparative proportionality review, there is a presumption that the sentence of death is proportionate to the crime of first degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn.1997). The nature of the crime and the defendant must be compared with the crimes and defendants in other cases in which the death penalty has been sought. State v. Middlebrooks, 995 S.W.2d 550, 561 (Tenn. 1999). This analysis seeks to identify aberrant sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d 651, 662 (Tenn.1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)).

In comparing similar cases, we consider such factors as (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667.

In comparing defendants, we consider: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. *Id.*

The facts and circumstances in this case have been detailed above. At the time of the murder, the twenty-three-year-old white male defendant was an inmate in the Dickson County jail. He was serving time for a burglary conviction. The female victim was a sixteen-year-old high school student. While on his way back to the jail from a work detail, defendant absconded with a sheriff's patrol car and proceeded to use the patrol car to pull over other vehicles, including the vehicle belonging to the victim. The victim's remains were found in the woods in a remote area. The expert testimony revealed that the victim was savagely beaten and suffered several blows to the head. The jury could further infer that the victim had been tied to two trees. The defendant denied any involvement in the crime. The jury found three aggravating circumstances: that the murder was especially heinous, atrocious or cruel; that the defendant was in lawful custody at the time of the murder; and that the murder was committed to avoid arrest or prosecution.

While no two cases are identical, considering the factors outlined above, we believe the following cases where the death penalty was imposed contain similar characteristics to the present one:

> In State v. House, 743 S.W.2d 141 (Tenn. 1987), the white male defendant apparently lured the female victim, who was in her late twenties, out of her house by telling her that her husband had been involved in a car wreck. The victim's body was found the next

-18-

day in a wooded area off the side of the road. The victim died as a result of blows to her head, and was possibly strangled. The defendant denied any involvement in the crime. The jury found three aggravating circumstances, including the murder was especially heinous, atrocious or cruel.

In State v. Kennath Artez Henderson, W1998-00342-CCA-R3-DD, Fayette County (Tenn. Crim. App. filed June 15, 1999, at Jackson), the defendant was an inmate in the Fayette County jail. One of the sheriff's deputies transported the defendant and another inmate to a local dentist for a scheduled appointment. During the visit, the defendant attempted an escape in which he shot and killed the deputy. The defendant was twenty-four years old. The defendant pled guilty and waived a jury determination of his sentence. The court found the existence of four aggravating circumstances, including the defendant was in lawful custody and that the murder was committed to avoid arrest or prosecution.

In State v. Alley, 776 S.W.2d 506 (Tenn. 1989), the thirty-year-old male defendant kidnapped, raped and murdered the nineteen-year-old female victim. The victim was jogging near a naval base when she was kidnapped by the defendant. The victim's body was found on the side of the road in the woods. She had sustained massive blows to her head. The defendant was sentenced to death based upon the finding of two aggravating circumstances, including the murder was especially heinous, atrocious or cruel.

In State v. Bates, 804 S.W.2d 868 (Tenn. 1991), the defendant, who escaped from jail while serving time for a burglary conviction, kidnapped a young female jogger in order to steal her car. He walked her into the woods where he tied her to a tree and shot her in the head. The defendant was sentenced to death based on three aggravating circumstances, including the murder was committed to avoid arrest or prosecution.

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year old defendant burglarized the home of the elderly victim, who was struck in the head at least five times with a blunt instrument. The jury found that the murder was especially heinous, atrocious or cruel.

In State v. John Michael Bane, W1997-02158-CCA-R3-DD, Shelby County (Tenn. Crim. App. filed January 24, 2000, at Jackson), during a robbery, the young defendant severely beat the elderly victim about the face and head and then strangled and drowned him. The jury found two aggravating circumstances: the murder was especially heinous atrocious or cruel and the murder was committed to avoid arrest or prosecution.

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the thirty-year-old defendant beat an elderly victim to death by repeated blows to the head. The jury found one aggravating circumstance, that the murder was especially heinous, atrocious or cruel.

We are convinced that the result in this case was neither disproportionate nor aberrant or arbitrary. Moreover, having thoroughly reviewed the record in this case, we conclude the evidence supports the jury's finding that the aggravating factors outweigh the mitigating evidence that was introduced on defendant's behalf.

## CONCLUSION

Based upon our examination of the entire record, we conclude the sentence of death was not imposed in an arbitrary fashion, and the evidence supports the jury's imposition of the death penalty. Accordingly, we affirm the sentence of death.