IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 19, 2020 Session

**STATE OF TENNESSEE v. TEVIN MANTEZ HARRIS**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2013-CR-747  Jill Bartee Ayers, Judge**

———————————————————

**No. M2019-01758-CCA-R3-CD**

———————————————————

Following a bench trial, the trial court convicted the Defendant, Tevin Mantez Harris, of first degree premeditated murder and imposed the statutory sentence of life in prison. On appeal, the Defendant asserts that: (1) the trial court erred when it denied his motion to suppress; (2) the evidence is insufficient to support his conviction; and (3) the trial court improperly permitted the State to refresh a witness's memory. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

Paul Bruno, Murfreesboro, Tennessee, for the appellant, Tevin Mantez Harris.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Jason C. White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the May 2, 2013 shooting death of the victim, Ronald Chapman. For his role in the victim's death, a Robertson County grand jury indicted the Defendant and a co-defendant, D'Angelo Qualon Pettis, of first degree premeditated murder. The grand jury also indicted the Defendant for unlawful possession of a gun with the intent to go armed.

*Suppression Hearing*

The Defendant filed a motion to suppress the gun that was found during the execution of his arrest warrant. He argued that the seizure was "unlawful, unconsented, [and] warrantless." At the suppression hearing, Springfield Police Department Detective[1] Charles Bogle testified that he was involved in a separate homicide investigation that resulted in a warrant for the Defendant's arrest. Police learned of a possible location for the Defendant at a residence on Grace Street in Springfield, and Detective Bogle participated in the execution of the arrest warrant on October 15, 2013.

Detective Bogle testified that, during the execution of the warrant, two officers went to the back of the Grace Street residence while the remaining officers "stacked up" at the front of the house. He explained this procedure as the officers lining up single file to approach and make entry into the residence. Detective Bogle, the first officer in the line, was "to cover" the large front window to the right of the steps leading up to the front door. He recalled that there were no drapes, blinds, or window coverings obscuring his view into the residence. As he approached, he saw the Defendant seated on the couch with a coffee table in front of him. Another officer's flashlight reflected off the front window drawing the Defendant's attention. The Defendant stood and bent over for a better view out the front window. Detective Bogle stated that he made eye contact with the Defendant and saw the Defendant reach down to the floor with his right hand. The detective's position, however, prevented him from seeing what, if anything, the Defendant held in his right hand. Detective Bogle shone his flashlight on the Defendant who stood up and "took off running."

Detective Bogle joined other officers at the front door and knocked. A man answered the door and exited the residence along with another man. Detective Bogle "held" the doorway while the other officers entered and then he moved to the doorway leading into the kitchen. The officers searched the area for the Defendant but did not find him. Captain[2] Madison Burnett advised Detective Bogle that he found a gun near the couch where Detective Bogle had first seen the Defendant. With the floor cleared, the officers deployed tear gas in the basement to force the Defendant back upstairs for the arrest.

---

[1] After the arrest but before the suppression hearing, Officer Bogle became a detective; therefore, we will reference him in the opinion as Detective Bogle.

[2] "Detective Burnett" had become a Captain by the time of the hearing and although Detective Bogle refers to "Detective Burnett," we will reference him by his title at the time of the hearing.

Detective Bogle testified that officers secured the living room, collecting the gun because, after deploying the tear gas, officers "back[ ] out" and they did not want to leave an unsecured weapon for the Defendant's use. Detective Bogle described this police protocol as a "quick search" to ensure that there were no weapons that could be used against officers during the arrest.

Springfield Police Department Captain Madison Burnett testified that, in a separate case, there was an arrest warrant for the Defendant for the shooting murder of Thomas Smith. Captain Burnett participated in the execution of this warrant on October 15, 2013. He recalled that Detective Bogle was at the front of the "stack" and alerted the other officers that he saw the Defendant inside the residence through the front window. The police knocked on the front door, and the man who answered the door confirmed the Defendant's presence in the residence before he exited the home. Captain Burnett said after "clearing" the ground floor, the officers believed the Defendant had fled downstairs to the basement. After determining that the Defendant was in the basement, Captain Burnett looked under the couch where Detective Bogle had seen the Defendant "reaching for something" and found a handgun.

Captain Burnett testified that, based upon the Defendant's flight to the basement, the police decided to use tear gas to force him upstairs. Due to the employment of this technique, Captain Burnett "certainly didn't want to leave a weapon inside the house with [the Defendant] while . . . the gas took effect." The tear gas was employed, the Defendant exited the basement, and officers placed him in custody.

On cross-examination, Captain Burnett reiterated that the officers cleared the floor for people before discussing the Defendant's probable location and the use of tear gas. After the officers determined the need for tear gas, Captain Burnett checked the area where the Defendant had been "reaching" to ensure there were no weapons that could be used against the officers upon the Defendant's retreat from the basement. Captain Burnett stated that the gun he found under the couch was a Ruger semi-automatic pistol. He recalled concern that the Defendant might begin shooting through the ceiling of the basement with another weapon. Captain Burnett agreed that the gun was not "in [the Defendant's] grab area" at the time Captain Burnett seized it.

On redirect examination, Captain Burnett confirmed that all officers exited the residence after the tear gas was deployed. He stated that he was standing beside the porch with a view into the house watching for the Defendant.

Minta Brown, owner of the Grace Street residence, testified that she, her fiancé, and her four children lived in the home on October 15, 2013. She did not know the Defendant nor had she ever given him permission to enter her home. She stated that she

worked the night shift and, as she was leaving to go to work on October 15, 2013, she saw the Defendant playing basketball with her son, Matthew Brown, in the neighbor's yard. When she returned home, the "Task Force" was there. She denied giving the Defendant permission to stay in her home or giving her son permission to allow the Defendant to stay in the home. She further denied that any of the residents of her home owned a nine-millimeter Ruger pistol.

On cross-examination, Ms. Brown acknowledged that because she worked at night she would not have known if the Defendant had been inside the home with her son on more than one occasion. She agreed that her son brought guests over from "time to time" and because guests sometimes entered through the basement door, she was not always aware of who was downstairs.

Matthew Brown testified that he did not recall the events of the Defendant's October 2013 arrest clearly because he was intoxicated at the time. Mr. Brown said that the Defendant did not live at the Grace Street residence but that he stayed "overnight from time to time." Mr. Brown recalled that the Defendant came to the house "a couple of times" but that he never brought groceries or "contributed to the livelihood [of] the home." About the night of the arrest, Mr. Brown said that the police did not announce themselves but "just kicked the door." He believed that the blinds on the front window were closed at the time. Before the police "kicked in" the door, the Defendant ran downstairs. Mr. Brown said that the police ordered him to the ground and then told him to get up and escorted him outside. Mr. Brown could not recall whether he had seen the Defendant with a gun that day, but he was not aware of any of his family members owning a gun.

On cross-examination, Mr. Brown testified that his stepbrother was inside the house at the time the police arrived to execute the arrest warrant. He agreed that, due to his intoxication, his stepbrother might have answered the door. Mr. Brown confirmed that the gun found underneath the couch was not his gun. He clarified that the Defendant only "hung out" at his house and had not spent the night. He agreed that the Defendant did not "have the right to say who comes and goes from the house." Mr. Brown testified that, when the police arrived, he saw the Defendant reach for something under the couch.

The Defendant testified that he went to the Grace Street residence to play basketball with Mr. Brown. After playing basketball, they went inside, and the Defendant sat on the couch to cool off. He recalled helping Ms. Brown bring groceries into the house and getting a drink. The Defendant arrived at the Grace Street residence during the day and stayed several hours until night. The Defendant denied having a gun with him at the time. He said that he and Mr. Brown were seated in the living room watching the television when Mr. Brown's stepbrother said that there was somebody at

the window, possibly the police. The Defendant moved for a better view out of the front window and saw a rifle. This scared him, so he fled to the basement. The Defendant denied reaching for "anything" under the couch or placing "anything" under the couch. He stated that he did not know there was a gun underneath the couch.

The Defendant testified that he was in the basement for approximately ten minutes. He remained there because he was fearful of being shot if he went upstairs. The Defendant testified about the blinds on the front window. He explained that they were "halfway closed" so that one could see out but that it would be "hard to see in."

On cross-examination, the Defendant confirmed that his residential address was 526 31ˢᵗ Avenue North and not the Grace Street address. The Defendant denied ownership of the Ruger found under the couch and reiterated that he did not know it was there. The Defendant agreed that, while they watched television before the police arrived, they saw a news story indicating that the Defendant was "wanted." He agreed that, when he saw the police at the Grace Street house, he knew there was an arrest warrant for him.

After hearing the evidence, the trial court issued a written order denying suppression of the gun.

> [D]efendant testified that he did not own the gun found in the home[ ]. Thus[,] he had no ownership in it nor did he have a possessory interest in the gun. Minta Brown was the sole owner of the home [ ] and she had not authorized the [D]efendant to be there. Therefore, [the D]efendant had no possessory interest in the place searched, nor did he have the right to exclude others from the home. He was legitimately on the premises as an invited guest of Matthew Brown, an occupant of the home, but he could have had no reasonable expectation of privacy in the home. The [D]efendant has not carried the burden of proof that he had a legitimate expectation of privacy in the home, and thus the Court finds that he has no standing to challenge the search of [ ] Grace Street, Springfield, Tennessee or the seizure of the handgun located in the home.
>
> The Court further finds however, even if the [D]efendant had established a legitimate expectation of privacy and standing to challenge the search and seizure, the search and seizure of the handgun was incident to arrest. The Springfield Police Department had a valid outstanding arrest warrant for the [D]efendant. He was located in the home and was seen reaching down with his hand. He was then observed running from the room and could not be located on the main floor. Prior to deploying tear

gas to bring the [D]efendant up from the basement, the officers searched and secured the area in order to protect the officers on the scene as the [D]efendant came back through the room.

*Trial*

On May 2, 2013, the date of the shooting, Sergeant Joe MacLeod was the first officer on the scene at a trailer park located at the corner of Main Street and 21st in Springfield, Tennessee. When he arrived at the trailer park at around sunset, he noticed a black car that had run into "the fence row." He approached the car and found Ronald Chapman ("the victim"), slumped over in the front seat, bleeding from his neck area. Sergeant MacLeod called for back-up units and protected the area with crime scene tape. As a patrol officer, Sergeant MacLeod was familiar with and confirmed the location of a Stop One Market directly across Main Street from the trailer park.

Brittany Henley and her sister were driving down 21st to the Stop One Market on the evening of May 2, 2013. When they came to the stop sign at the corner of 21st and Main Street, she noticed the victim's vehicle parked at a diagonal in the trailer park. She recalled that co-defendant Petties's car was also parked there and she saw co-defendant Petties and the Defendant, who were cousins, standing at the driver's side of the victim's car. Ms. Henley heard the victim yell three different times, "back up off my car." The sisters decided that after they made their purchases at the Stop One Market, they would drive to the trailer park and try to separate the men.

Ms. Henley testified that as she waited in line to purchase her items, she noticed people gathering by the door of the store. She heard three or four gunshots and walked over to the door. She saw co-defendant Petties driving away and the Defendant running toward the back of the trailer park. She heard someone say, "they shot [the victim]," causing her to drop "everything in [her] hands and call 911." While on the phone with the 911 operator, Ms. Henley and her sister walked across Main Street from the Stop One Market to the trailer park. As they approached, Ms. Henley saw the victim's car roll toward a tree stump. When they reached the victim's car, Ms. Henley's sister approached the victim and spoke to him while Ms. Henley remained on the phone with the 911 operator. Later, Ms. Henley provided a statement about these events to the police. Ms. Henley admitted that she had since been arrested and convicted of theft for stealing laundry detergent from a Dollar Store in Sumner County. This conviction violated her probation sentence for "shoplifting at Kohl's."

On cross-examination, Ms. Henley testified that she had known the victim most of her life. Ms. Henley did not know the Defendant personally but had seen him around the

neighborhood. Ms. Henley admitted that she had a "problem" with "oxymorphone" but stated that she was not presently under the influence of any drugs.

Kelly Robertson was also present at the Stop One Market when the shooting occurred. Ms. Robertson was sitting in a car outside the market with her son while her friend went inside the market. Ms. Robertson heard loud voices coming from the trailer park across the street and saw two black men standing outside of a black car arguing with a man inside the car. Ms. Robertson did not recognize any of the men but described the two men outside the car. She said that one man was approximately five to six inches taller than the other and she "believe[d]" wore a white t-shirt. The shorter man wore a gray and black striped shirt. She did not see the man, later identified as the victim, inside the car until he twice attempted to exit the car.

Ms. Robertson testified that, initially, it appeared the man wearing the white shirt was attempting to defuse the argument. She observed him positioning himself between the car and the man wearing the striped shirt. He then placed his hands on the top of the black car and told the victim to leave. The reverse lights on the black car illuminated, and she saw the car begin to back up. Ms. Robertson turned away briefly to attend to her son and when she looked back, it appeared the man wearing the white shirt had entered the argument. While speaking to the victim, the man wearing the white shirt, "pull[ed] a gun, put[ ] it inside [the] car window and pull[ed] the trigger multiple times." She stated that she heard at least five gunshots.

Ms. Robertson testified that she watched as the man wearing the striped shirt fled on foot and the man wearing the white shirt opened the driver door and pulled the victim out of the car and on to the driveway. The car continued to roll forward toward the tree line. The man wearing the white shirt then got into a vehicle and drove away.

When asked to confirm if the man wearing the white shirt was the shorter or the taller man, Ms. Robertson stated "I can't remember exactly – I know that he had on a white t-shirt. I remember that he had on a white t-shirt . . ." The State then asked if reviewing her May 3 statement to the police might help Ms. Robertson to refresh her memory. The trial court instructed Ms. Robertson to review the statement silently and then return it to the court officer. Ms. Robertson complied with the instructed procedure and then the following exchange occurred between the parties:

[Defense]: Your Honor, before she is allowed to answer the question, I would make an objection on the record for - - I don't know that she was confused when she answered the question the first time? She didn't act as if she couldn't remember or wasn't sure. She testified as to what she remembered happening, so I don't know that this is

- 7 -

refreshing her recollection? I would object to being able to testify about anything that happened she has (inaudible).

[State]: She paused, if you remember that question, she paused and kind of – almost like a huff and then she said it. So, she was - - based on that, Your Honor, and I think I asked her, were you certain? And she said no, I wasn't. I think in all fairness to Ms. Robertson she should be allowed to review her statement and then answer.

The Court: Sure. I appreciate your objection. I am going to overrule based on what I observed and listened to Ms. Robertson say.

Ms. Robertson confirmed that reviewing her statement refreshed her memory and testified that the man who wore the white shirt, the shooter, was the shorter of the two men.

On cross-examination, Ms. Robertson testified that the shorter man wore the white shirt and was "skinnier." The man in the striped shirt was "thicker." She confirmed that the man wearing the striped shirt was "aggressive" and arguing with the victim. It appeared the man wearing the white shirt, "the shooter," was attempting to defuse the situation until the victim began backing up his car and then the shooter began arguing with the victim, produced a gun in his left hand, and pulled the trigger. Ms. Robertson speculated that the victim may have put the car in neutral once the argument resumed because the car rolled forward after the man in the white shirt shot the victim. Ms. Robertson confirmed that she was certain that the shooter pulled the victim out of the vehicle and laid him on the ground. She also confirmed that she had seen the shooter place his hands on the roof of the victim's car and tell the victim to leave. After the shooting, Ms. Robertson saw the two men in a vehicle driving on Main Street "toward town."

Adele Lewis, Deputy State Chief Medical Examiner, testified as an expert witness in the field of forensic pathology. She confirmed that she performed the autopsy of the victim's body in May 2013. She stated that the victim

had two indeterminate or distant range gunshot wounds to the left side of his face with injuries of the bones of his face and the brain and a gunshot wound to the left side of his neck, with injuries to the major blood vessels in the neck. And then a gunshot wound to the right arm, with injuries of the skin and soft issues only.

- 8 -

She opined that the wounds to the face would have rendered the victim unconscious and the neck injury likely caused death. She explained that both injuries were terminal; however, the neck injury would have "more rapidly" caused death. Based upon her examination, Dr. Lewis concluded that the cause of death was multiple gunshot wounds.

Elizabeth Reid, a Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist, testified as an expert witness in the field of latent print identification. Special Agent Reid processed the victim's black Chevrolet for latent fingerprints and collected cartridge casings from inside the vehicle. Special Agent Reid photographed the Chevrolet, performed an inventory of the Chevrolet, and examined it for the presence of latent prints. She stated that she found twenty identifiable latent prints on the inside and outside of the Chevrolet. After comparison to known prints, Special Agent Reid determined that the Defendant's prints were located above the driver's side window on the exterior of the vehicle. The alignment of the palm print and ten fingers were "consistent with one touch." Special Agent Reid confirmed that the victim's prints were located throughout the car.

On cross-examination, Special Agent Reid testified that she was provided known comparison prints for the victim, co-defendant Petties, the Defendant, and Reanio Ogburn. She further confirmed that not all of the prints found were identifiable. Of the identifiable prints that were collected, some did not match to any of the known comparison prints provided to her. She agreed that the lifted prints associated with the Defendant were of his left hand only.

Lieutenant Bogle and Captain Burnett testified about the Defendant's October 15, 2013 arrest, consistently with their suppression hearing testimony. Lieutenant Bogle added that, once he observed the Defendant fleeing into the house, he began "yelling police." He confirmed that two individuals inside the residence confirmed the Defendant's presence and then exited the house. Lieutenant Bogle stated that neither of the two men who exited were co-defendant Petties. He stated that co-defendant Petties was taller and bigger, "huskier," than the Defendant.

Robert Moss testified that he currently worked at the Memphis Union Mission but, in 2017, he had been furloughed from the Robertson County jail. During his time in jail, he had shared a cell with the Defendant and "Tevin Chapman." One night the Defendant and Mr. Chapman were discussing the crimes associated with their incarceration. Mr. Moss overheard the Defendant state that he and "D low" were at a store and saw the victim. "D low" offered the Defendant two thousand dollars to kill the victim. According to Mr. Moss, the Defendant stated that they approached the victim in his car, talked to him, and then the Defendant pulled a gun and shot the victim, who was seated in

the car. After overhearing this discussion, Mr. Moss provided the information to the State, and he was furloughed to a drug rehabilitation program.

On cross-examination, Mr. Moss confirmed his prior convictions included multiple counts of theft, drug-related offenses, assault, and possession of a handgun by a convicted felon. Mr. Moss agreed that inmates will sometimes exaggerate about their experience to display their strength in hopes of discouraging other inmates from "mess[ing]" with them. Mr. Moss had also provided information to the State about two other inmates.

Steve Scott, TBI Special Agent Forensic Examiner, processed the victim's vehicle for bullets and bullet trajectories. He identified three distinct bullet paths that traveled through the vehicle. Based upon his examination of the vehicle, it appeared that a firearm was discharged "either in or right at the [driver's side car] window." Agent Scott also examined the handgun recovered from the Grace Street residence and the two bullets recovered from the victim's body, confirming that the bullets had been fired from the handgun. He also examined the bullets recovered from the victim's vehicle, concluding that they were fired from the handgun the police recovered from underneath the couch at the Grace Street residence.

Testifying for the defense, Tonnika Harris, the Defendant's niece, stated that in 2013, she lived with her grandmother, Ms. Brown, where the Defendant and his brothers also lived. Ms. Harris witnessed an argument between the Defendant and his brother, Carrecus Bell, while living at Ms. Brown's house. Ms. Harris stated that Mr. Bell died in 2013, but she recalled that, during the argument between the two brothers, Mr. Bell told the Defendant that "it was an accident that wasn't meant to happen (sic), that he killed [the victim]."

On cross-examination, Ms. Harris admitted that she did not disclose this conversation to authorities even after the Defendant was arrested for the homicide. Ms. Harris testified that Mr. Bell had a "P" tattooed on his cheek, a "reaper" on his face, and another tattoo on his neck with a star.

Eva Mae Harris, the Defendant's grandmother, testified that she also witnessed the 2013 argument between the Defendant and Mr. Bell. Ms. Eva Mae Harris intervened in the argument and Mr. Bell admitted to her that he shot "his cousin." She confirmed that the victim was the Defendant's cousin.

On cross-examination, Ms. Eva Mae Harris testified that both the Defendant and co-defendant Petties were her grandsons. She admitted that she had not notified the

police of Mr. Bell's confession even after both of her grandsons were arrested for the victim's murder.

The Defendant testified that he did not kill the victim. He stated that he did not witness the shooting but that Mr. Bell had confessed to killing the victim. The Defendant was unclear on how he and the victim were related but confirmed that they were cousins. Although the Defendant and Mr. Moss were incarcerated at the same time, the Defendant did not remember whether they had shared a cell, stating "I never recognized him." He did recall, however, an interaction with Mr. Moss when Mr. Moss was being "disrespectful" and "racist," so the Defendant "[s]macked" Mr. Moss. The Defendant denied making any of the statements Mr. Moss attributed to the Defendant.

The Defendant testified that he had three separate interactions with the victim on the day he was killed. He explained

> The first time I was around him we was on Goldcrest (phonetic), I got a cousin named Bobby Dowlen, we was up [at] his house. It was me, Bobby Dowlen and [the victim]. We was on the porch. He had the cigars, I was fixing to roll up and he told me to go get it. So, I opened the door – I touched the car, I touched the car.

The Defendant denied that he and the victim had any disagreement that day. The Defendant saw the victim again near his cousin, "Vanisha's", house. The victim flagged the Defendant over and inquired about "a dice game."

The Defendant testified that he and the victim later met at the trailer park where "dice games" were often held. The Defendant did not see co-defendant Petties present, but Mr. Bell was at the trailer park. The victim was standing outside his car arguing with Mr. Bell's friends. The Defendant approached and saw that the victim had an AK47 "on him" and decided the victim was "good." He encouraged the victim to leave and then began the walk back to his cousin's house to retrieve his cell phone. About halfway to his cousin's house, he heard gunshots. Out of concern for Mr. Bell's safety, he ran back toward the trailer park and heard "a horn." He saw Mr. Bell's friends running away from the trailer park and then Mr. Bell with an "AK like around his shoulder." The Defendant confirmed that the AK-47 was the victim's gun. Mr. Bell discouraged the Defendant from returning to the trailer park, but the Defendant continued and saw "lights coming through the bushes." Later, the Defendant engaged in an argument with Mr. Bell about the shooting, and Mr. Bell admitted that he had killed the victim.

On cross-examination, the Defendant testified that Mr. Bell died a little less than two months after the victim was killed. The Defendant was unable to describe or identify

- 11 -

any of the people he saw at the trailer park before the victim was shot. He agreed that he had not provided any descriptions of individuals present when he spoke with the police. He further agreed that his trial testimony about the events leading up to the shooting was not what he had told the police in October 2013.

The State called Ms. Henley as a rebuttal witness. Ms. Henley testified that she knew Mr. Bell and recognized him from the neighborhood. She affirmed that she was certain that she saw co-defendant Petties and the Defendant speaking with the victim. She explained that she would not have confused the Defendant with Mr. Bell because Mr. Bell was lighter-skinned and had distinctive tattoos on his face. After the police arrived, Ms. Henley saw Mr. Bell among the approximately fifty people who had gathered in the area.

After hearing the evidence, the trial court found the Defendant guilty of first degree premeditated murder and imposed a life sentence to run concurrently to another sentence and dismissed the remaining charge.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it denied his motion to suppress; (2) the evidence is insufficient to support his conviction; and (3) the trial court improperly permitted the State to refresh a witness's memory. The State responds that the trial court properly denied the motion to suppress because the Defendant had no reasonable expectation of privacy in the home where he was arrested and the search was incident to his arrest for the protection of the officers. The State also asserts that the witness accounts, latent fingerprint analysis, and the Defendant's possession of the murder weapon provided sufficient evidence to support the conviction. Finally, the State contends that the record supports the trial court's permitting the State to refresh Ms. Robertson's memory.

## A. Motion to Suppress

The Defendant asserts that the search of the Grace Street residence was unlawful and, therefore, the trial court erred when it denied his motion to suppress. The State responds that the trial court properly found that the Defendant did not have a reasonable expectation of privacy in a residence where he was merely a visitor. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will

be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

In Tennessee, a guest's standing to challenge the admission of evidence seized during the search of his host's home depends on whether the guest was a casual or regular visitor. *State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996). A guest is a casual visitor if he does not have a key to the home and otherwise does not have the right to exclude others from the residence. *Id*. A casual visitor, absent specific indicia of an expectation of privacy, does not have standing to challenge a search of his host's home. *Id*.; *see U.S. v. Dix*, 57 F.3d 1071 (6th Cir .1995) ("As a casual, albeit frequent, visitor to his sister's apartment, who did not keep clothing there, who did not receive mail there, and who had no key, Dix had no reasonable expectation of privacy in the premises."). In contrast, a regular visitor does have standing to challenge evidence seized during a search of his host's home. *Transou*, 928 S.W.2d at 958. Typically, a regular visitor has a key or an ability to exclude others, enjoys unrestricted access, may stay overnight without the host's knowledge, and stores his belongings in the host's home. *Id*.

At the suppression hearing, Ms. Brown testified that she had not given the Defendant permission to be in her home nor had she given her son permission to allow the Defendant to stay in her home. Mr. Brown testified that the Defendant had "hung out" at the house but that he had never spent the night. He stated that the Defendant did not have the authority to exclude or include someone from the residence. The evidence does not preponderate against a finding that the Defendant was a casual visitor to the Grace Street residence. The Defendant did not claim any ownership of the house or the gun. Moreover, he denied any knowledge of the presence of the gun under the couch. "[W]hen a person disclaims any interest in the premises or possessions searched, or in the article seized, he can not question the legality of the search." *Miller v. State*, 520 S.W.2d 729, 734 (Tenn. 1975) (quoting *Neal v. State*, 334 S.W.2d 731 (Tenn. 1960)). Accordingly, we conclude that the trial court properly denied the Defendant's motion to suppress because the Defendant, as a casual visitor to the Grace Street residence, did not

have standing to challenge the seizure of the gun during the execution of his arrest warrant.

## B. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his conviction for first degree premeditated murder because the State failed to establish premeditation and present proof of his identity as the shooter. The State responds that witness testimony and possession of the murder weapon at the time of his arrest support the conviction. Likewise, the Defendant's use of a deadly weapon on an unarmed victim and testimony regarding a motive supports the trier of fact's determination that the Defendant acted with premeditation when he shot and killed the victim. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the

testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus[,] the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*,

881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, presented in the light most favorable to the State, proved that the Defendant and co-defendant Petties approached the unarmed victim and engaged in an argument. As the victim began to back away in his car, the Defendant reengaged the victim in an argument, pulled out a gun, and shot the victim multiple times. The Defendant and co-defendant Petties fled. Several months later, during his arrest for the murder, the murder weapon was found on the floor underneath the couch where the Defendant had last been seated. We note that much of the Defendant's argument in his brief is challenging the weight given the evidence or alleged inconsistencies in the testimony. The trier of fact heard the State's and the Defendant's version of what occurred and was entitled to decide and resolve for itself any inconsistencies in the evidence presented. By its verdict, the trier of fact chose to accredit the State's witnesses at trial, and we will not re-weigh this finding. *See Bland*, 958 S.W.2d at 659.

As to the Defendant's identity as the shooter, Ms. Henley was familiar with the Defendant and observed him arguing with the victim who was seated in his car shortly before the shooting. After the gunfire, Ms. Henley saw the Defendant fleeing the scene. Ms. Robertson testified that she saw a man, consistent with the Defendant's size and build, place his hands on the hood of the victim's car and then pull out a gun and shoot the victim. The Defendant's handprint was found on the hood of the victim's car in the location described by Ms. Robertson. Mr. Moss also testified to a conversation between the Defendant and another inmate during which the Defendant described the offense and admitted shooting the victim. This is sufficient evidence upon which a rational trier of fact could find beyond a reasonable doubt that the Defendant shot and killed the victim.

The Defendant also asserts that the State failed to prove premeditation. We disagree. The State's proof showed that the Defendant possessed a gun and fired on the unarmed victim who was attempting to leave. The State also presented evidence of motive, shooting the victim for $2,000, through Mr. Moss. This is evidence upon which a trier of fact could reasonably infer that the Defendant intentionally shot and killed the victim and that this murder was premeditated.

Accordingly, we conclude that there is sufficient evidence upon which the trial court could find that the Defendant intentionally and with premeditation shot and killed the victim. The Defendant is not entitled to relief as to this issue.

### C. Refreshed Recollection

The Defendant argues that the State failed to establish that Ms. Robertson's memory needed to be refreshed with the use of her prior statement to the police. The State responds that the trial court properly permitted the State to refresh Ms. Robertson's memory. We agree with the State.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003). In making these decisions, the trial court must consider "the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Tennessee Rules of Evidence 612 establish the circumstances and procedures for refreshing the memory of a witness using a prior statement of the witness. The Advisory Commission Comment to Rule 612 explains the foundation necessary and procedure to be used when the memory of a witness is refreshed by a writing:

> Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn. Rule Evid. 612, Advisory Comm'n Cmt.

The trial court acted within its discretion in permitting the State to refresh Ms. Robertson's memory. Ms. Robertson showed hesitation initially by qualifying her identification of the height of the two men by stating, "He's the taller one, I believe?" The State continued its line of questioning but returned to the question about which man was taller, the man wearing the white shirt or the striped shirt. Ms. Robertson stated, "I can't remember exactly – I know that he had on a white t-shirt. I remember that he had on a white t-shirt . . . ." The State then asked if reviewing her police statement would help her to remember. The court instructed Ms. Robertson to review the statement to herself and then return the statement to the prosecutor before further questioning. Ms. Robertson complied. In our view, the State laid the proper foundation after Ms. Robertson expressed some equivocation about her identification. Ms. Robertson expressly stated that she could not "remember exactly." The record supports the trial court's conclusion that a proper foundation had been laid allowing for Ms. Robertson to refresh her memory. Accordingly, the Defendant is not entitled to relief as to this issue.

## III. Conclusion

Based on the foregoing, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE